United States Court of Appeals,

Eleventh Circuit.

No. 95-8871.

Denise CHILDREE, Plaintiff-Appellant,

v.

UAP/GA AG CHEM, INC., et al., Defendants-Appellees.

Aug. 28, 1996.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:94-CV-1312-FMH), Frank M. Hull, Judge.

Before CARNES, Circuit Judge, and FAY and GIBSON[*], Senior Circuit Judges.

CARNES, Circuit Judge:

After more than five years with one of the defendants, UAP/GA AG CHEM., INC. ("UAP/GA"),[1] the plaintiff, Denise Childree, was terminated from her employment. Her termination occurred approximately one week after she testified in an administrative hearing before the Department of Agriculture (the "DOA"), about a suspected fraudulent billing scheme allegedly used by a customer of UAP/GA, Varner Bass Enterprises, Inc., to bilk money out of the United States government. Although Varner Bass, and not UAP/GA, was a party to the hearing, Childree's testimony was unfavorable to UAP/GA, also. Her testimony allegedly exposed UAP/GA's assistance to Varner Bass in its fraudulent scheme against the government.

The question on appeal is whether the district court correctly granted summary judgment to the defendants, holding that Childree's

---

[*]Honorable John R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

[1]The other defendant is ConAgra, UAP's parent company. UAP/GA is the Georgia branch of UAP.

termination did not violate the whistleblower protection provision of the False Claims Act of 1986, 31 U.S.C. § 3730(h), or violate the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3). For the reasons stated below, we reverse the district court's grant of summary judgment to the defendants on the whistleblower protection claim, and affirm the district court's grant of summary judgment to the defendants on the Klan Act claim.

## I. FACTS AND PROCEDURAL HISTORY

Because we are reviewing the district court's grant of summary judgment in favor of the defendants, we view the evidence in the light most favorable to the plaintiff. *See, e.g., Flores v. Carnival Cruise Lines,* 47 F.3d 1120, 1122 (11th Cir.1995). Viewed in that light, the facts are as follows.

While employed by UAP/GA, Childree's job responsibilities included billing customers. UAP/GA sells fertilizer, seeds, and other related products to farmers. In June 1989, a representative for one of UAP/AG's primary customers, Varner Bass, requested that Childree re-bill certain invoices. The invoices had been billed to Varner Bass, and its representative requested that they be re-billed to a number of other individuals, all of whom allegedly leased land from Varner Bass, but whom Childree believed were merely subsidiary fronts for Varner Bass. Childree refused to comply, because she believed the re-billing request was part of an attempt to defraud the United States government. Varner Bass, and other farming businesses, receive reimbursement up to a maximum of $50,000-per-claim from the DOA's Agricultural Stabilization and Conservation Service ("ASCS") for monies expended in connection

with various farming activities.  Childree believed that Varner Bass's request for the re-billings was an attempt to use subsidiary fronts to evade the $50,000-per-claim reimbursement ceiling and thereby illegally obtain excessive payments from the government.

Childree raised her concerns about the re-billing request to one of UAP/AG's credit managers.  He replied, "Who is to say you wouldn't do it if given the opportunity."  Childree next raised her suspicions to another UAP/AG credit manager, who informed her, in essence, that the less she knew, the better.  Childree then reported her concerns to two of her supervisors.  One of them directed her to process the re-billings as they had been submitted, and the other one, Darryl Mathis, apparently said nothing. Despite her supervisor's directive, Childree refused to process the re-billings;  the re-billing forms sat on Childree's desk until that supervisor processed them himself.

One month later, in July 1989, Eloise Taylor, a local ASCS official, visited UAP/GA's office, and met with Childree and Mathis.  Taylor requested verification of the validity of the re-billings that had been submitted to the ASCS on behalf of Varner Bass.  Mathis told Childree to tell the truth.  Childree informed Taylor that she could not verify the validity of those documents. Taylor then asked Childree to tell her what was going on, and Childree did so.  Shortly after that meeting, Childree sent Taylor a written statement, which repeated what Childree had told her in person.   After Taylor's visit, Childree made copies of the completed re-billing forms, which were still on the counter waiting to be filed, and took those copies home.  Mathis was aware that

Childree was making copies of the documents, and he told her to do whatever she had to do to protect herself. Childree says that she had not planned on using the copies, but wanted to keep them because they were represented as coming from her office.

Four years later, in June 1993, the DOA subpoenaed Childree to appear at a hearing before its National Appeals Division (the "NAD") concerning the alleged fraudulent schemes of Varner Bass and other farming businesses in conjunction with the ASCS program. The subpoena required that Childree bring to the hearing all documents, personal notes, and written statements relating to the 1989 farming operations of Varner Bass. Childree was reluctant to testify at the hearing, because she feared she would lose her job if she did. Nevertheless, on June 24, 1993, under subpoena, she did testify at the hearing about the Varner Bass re-billings, and about her attempts to report to her superiors what she believed to be fraudulent activities in connection with those re-billings. She also turned over her copies of the Varner Bass re-billing forms. Gary Callahan, an officer of UAP,[2] attended the DOA hearing. According to Childree's deposition testimony, during a break in the hearing, Callahan went into the room where some of the other witnesses were sequestered and threw a yellow pad on the table. According to Childree, he said that "these were the issues, that [Childree] had just blown the whole thing, and [that she] didn't know how to handle business."

In August 1994, the NAD issued its findings, in which it concluded that Varner Bass, along with several other farming

[2]See *supra* n. 1.

operations, had engaged in a scheme designed to evade ASCS payment limitations. Although UAP/GA was not a party to the NAD hearing, the NAD stated in its findings that UAP/GA had assisted in and participated in the scheme.

On July 1, 1993, UAP/GA suspended Childree from her employment without pay, and on July 9, 1993, terminated her employment. UAP/GA stated that Childree was being terminated for removing confidential customer files from the company's premises without authorization, *i.e.,* the copies of the re-billing forms that she had taken home in 1989 and produced at the 1993 hearing.

Childree concedes that before her termination, she never considered bringing a False Claims Act action with regard to the Varner Bass re-billings, and that in fact, she had never heard of that Act. She also concedes that the statute of limitations for bringing such a *qui tam* action has now run. *See* 31 U.S.C.A. § 3730(b) (West Supp.1996). In addition, the government has never brought, threatened to bring, or even considered bringing a False Claims Act action against UAP/GA or its parent company, ConAgra, for their role in Varner Bass's fraudulent scheme.

In May 1994, Childree filed this suit against UAP/GA and ConAgra claiming that: (1) the defendants had violated the whistleblower protection provision of the False Claims Act of 1986, 31 U.S.C. § 3730(h), by terminating her employment in retaliation for her actions with regard to the Varner Bass re-billings; (2) the defendants had violated the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), by conspiring to deprive Childree of her right to testify; and (3) the defendants had intentionally inflicted

emotional distress on Childree in violation of Georgia state law.

In March 1995, the district court granted summary judgment in favor of the defendants on the whistleblower protection claim and the Klan Act claim.[3]  Having dismissed all of the federal claims, the court also dismissed without prejudice the state law claim. [4] Childree appeals.

## II. DISCUSSION

A. THE WHISTLEBLOWER PROTECTION CLAIM, § 3730(h)

The district court granted summary judgment to the defendants on the whistleblower protection claim, because it concluded that Childree's conduct was not covered by the whistleblower protection provision of the False Claims Act of 1986.  That provision states, in pertinent part:

> Any employee who is discharged, demoted, suspended,

---

[3]The court also denied as moot ConAgra's earlier motion for summary judgment, in which ConAgra argued that even if UAP/GA was liable, ConAgra was not liable because it did not employ Childree.  Our disposition of this case requires that we vacate that denial.

[4]We also vacate the district court's dismissal without prejudice of Childree's state law claim.  That dismissal was based upon the court's grant of summary judgment in favor of the defendants on both federal claims.  Because we reverse the district court's grant of summary judgment on the whistleblower protection claim, the district court on remand should revisit the matter involving Childree's state law claim.  *See* 28 U.S.C.A. § 1367(a) (West 1993).

In addition, we vacate the district court's denial of Childree's revised motion for leave to file an amended complaint.  In that motion, Childree had sought to add additional state law claims and additional defendants.  The court's denial of that motion was based upon its grant of summary judgment on the federal claims in favor of the defendants.  Because we reverse that judgment insofar as it concerned the whistleblower protection claim, the district court will have the opportunity on remand to reconsider Childree's motion for leave to file an amended complaint.

> threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C.A. § 3730(h) (West Supp.1996).

The district court stated that Childree, "at a minimum, must show some nexus between her conduct and the furtherance of a potential False Claims Act action." The court stated that Childree had failed to demonstrate that nexus because there was no "potential False Claims Act action" in any way related to her conduct. Neither Childree nor the government had filed, or had ever intended to file, such an action. To the contrary, the district court found that the government had chosen to pursue the administrative route in lieu of filing a False Claims Act action. The court noted that the DOA administrative hearing was not an "action" contemplated by § 3730(h), and therefore did not put Childree's conduct within the provision's protection. It held that "action" means a False Claims Act action under either 31 U.S.C. § 3730(a) or (b).[5]

The district court also said that Childree had "never performed any affirmative act to expose any alleged fraud." Instead, it found that she simply had responded to questions asked of her by the ASCS investigator and by the DOA during the NAD hearing. By Childree's own admission, she had only reluctantly

[5]Subsection (a) deals with actions brought by the government for false claims, and subsection (b) deals with *qui tam* actions brought by private litigants.

participated in that hearing.

Childree, and the United States as amicus curiae, contend that the district court erred in granting summary judgment to the defendants on the whistleblower protection claim. Although they concede that the administrative hearing was not an "action" as contemplated by § 3730(h), they still contend that Childree was protected because she "assist[ed] in an action ... *to be filed* under [§ 3730(h) ]." *See* 31 U.S.C.A. § 3730(h) (West Supp.1996) (emphasis added). They argue that the district court lost sight of the central question in a § 3730(h) claim, which they contend is whether the employer intended to retaliate against the employee because of the false claims information that the employee provided to the government. According to them, the "to be filed" language of § 3730(h) does not mean, as the district court held, that such an action ever has to be actually filed, or even contemplated. Such a "retrospective" interpretation, they contend, does not comport with the plain language of that provision, and would lead to nonsensical results. For example, they point out that under that interpretation, an employee who provided information to the government about her employer's fraud would not be protected if the government settled with the employer *before* filing a false claims action.

Childree and the government argue that "to be filed" means whether an action "could" have been filed. They contend that that broad interpretation of the provision fits with the provision's language and purpose. They argue that § 3730(h) was intended to encourage employees to bring information to the government about

false claims against it, without fear of retaliation. *See Neal v. Honeywell, Inc.,* 33 F.3d 860, 861 (7th Cir.1994) ("Section 3730(h), added to the False Claims Act in 1986, is designed to protect persons who assist the discovery and prosecution of fraud and thus to improve the federal government's prospects of deterring and redressing crime."). Because an employee who brings such information to the attention of the government may not know whether a false claims action can or will be filed, it is doubtful that under the "retrospective" construction of "to be filed" the employee would feel sufficiently protected from retaliation to turn the information over to the government. Or so the argument goes.

Childree and the government urge us to follow the Seventh Circuit's decision in *Neal v. Honeywell, Inc.,* which held that § 3730(h) applied to an employee who indirectly had provided false claims information to the government, 33 F.3d at 864, even though in that case a false claims action was never filed, *id.* at 861. After concluding that co-workers were defrauding the government by falsifying company data reports, the plaintiff in *Neal* informed her employer's legal counsel of the fraud, and the counsel immediately notified the government. *Id.* at 861. The government commenced an investigation, the results of which convinced the employer that the plaintiff's accusations were correct. *Id.* The employer and the government settled for $2.5 million, and no false claims action was ever filed. *Id.*

The *Neal* plaintiff's immediate supervisors allegedly were displeased with her honesty and began to harass as well as physically threaten her. She quit, and several years later, filed

a suit under § 3730(h). *Id.* The employer argued that because the government settled rather than sued, § 3730(h) was inapplicable. The Seventh Circuit disagreed, and held that the plain language of § 3730(h) supported the plaintiff's claim, *id.* at 863-64, reasoning that "[i]t makes both linguistic and practical sense to understand the actual "filed or to be filed' formulation as linking protection to events as they were understood at the time of the investigation or report," *id.* at 864. The court went on to conclude that because litigation was a distinct possibility when the plaintiff reported what she had learned, she was entitled to protection under § 3730(h).

The court recognized that one could argue, as the employer did, that the "to be filed" language is intended simply to ensure that "the employer may not retaliate for reports made before the litigation gets under way." *Id.* Even so, the court concluded that such a construction of the provision was inferior to the court's, because it would lead to the conclusion that by immediately settling with the government—and thus ensuring that a suit was never filed—the employer had "purchase[d] an option to retaliate against [the plaintiff]." *Id.* The court found that scenario to be unacceptable, and noted that there was nothing in the language or background of § 3730(h) to support such an outcome. *Id.*[6]

---

[6]Besides *Neal,* only one other court of appeals has addressed § 3730(h). That case, *Robertson v. Bell Helicopter Textron, Inc.,* 32 F.3d 948 (5th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995), involved a situation quite different from the present one, and for that reason, it is not particularly useful for present purposes. Although the *Robertson* plaintiff had voiced concerns to his superiors that his employer might be overcharging the government, *id.* at 949-50, he had never referred to the overcharging as illegal or unlawful,

We agree with the *Neal* court that the "to be filed" language does not require that a False Claims Act action ever have been filed. We are bound to follow the plain language of a statute, *see, e.g., Scarborough v. Office of Personnel Management,* 723 F.2d 801, 813 (11th Cir.1984), and there is nothing about the plain language of "to be filed" that suggests such a narrow interpretation. Moreover, as the Seventh Circuit pointed out in *Neal,* a retrospective test which furnished no protection unless an action was eventually filed would preclude protection in every case where the evidence of wrongdoing was so compelling that the employer settled before an action was filed. 33 F.3d at 864. We join the Seventh Circuit in disbelieving that Congress intended such a result, and we join it in holding that § 3730(h) protection is available not only where a false claims action is actually filed, but also where the filing of such an action, by either the employee or the government, was "a distinct possibility" at the time the assistance was rendered.

We recognize that there will be cases, such as this one, in which the employee was apparently unaware of the existence of the False Claim Act in general, and § 3730(h) in particular, at the

---

*id.* at 951 & n. 2. He had never voiced an intention to file a *qui tam* action under § 3730(b), nor had he ever spoken to government officials about the alleged overcharging. *Id.* at 952. However, when he was laid off as part of a general workforce reduction, he brought suit against his employer under § 3730(h) claiming unlawful retaliation.

> The Fifth Circuit held that § 3730(h) did not protect the plaintiff because there was insufficient evidence that he had furthered or assisted in any "action," and also because there was insufficient evidence that his employer was aware that the plaintiff was investigating the overcharging.

time the employee acted.  There is some force to the argument that a provision cannot encourage acts by offering to protect the actor where the actor is unaware of the provision and the offered protection.  However, nothing in the language of § 3730 suggests that its protections are limited to those who were motivated by it. The provision contains no knowledge requirement, and we will not read one into it.

We turn now to an application of the distinct possibility test to the facts of this case viewed in the light most favorable to Childree, the non-movant.  Childree concedes that she never even considered filing a § 3730(b) *qui tam* action, so it is obvious that such an action was never a distinct possibility.  The question, then, is whether the government's filing a § 3730(a) action was a distinct possibility at the time Childree rendered her assistance. We think that summary judgment should not have been granted against Childree on this issue.  Viewing the facts in Childree's favor, in July 1989, she provided extensive information about her employer's fraudulent re-billings to Taylor, the ASCS official who visited UAP/GA's office.  Several years later, at the NAD hearing, Childree again provided the information about her employer's fraudulent re-billings to the DOA.  Based upon Childree's testimony, the DOA found that "Cook [a Varner Bass representative] and UAP/GA Ag. Chem. created documentation to create an appearance that crop inputs used on the farming operations ... were separately ordered, delivered, used and paid for by the persons in whose names the accounts were later established." Moreover, the DOA concluded that "[o]ne of the most egregious examples of falsifying documents, in

addition to the false leases, involved Cook and UAP/GA Ag. Chem."

If those asserted facts, and Childree's deposition testimony about the re-billings, are ultimately determined to be true, then a § 3730(a) action was a distinct possibility at the time Childree rendered her assistance. Therefore, summary judgment should not have been granted in favor of the defendants. Accordingly, we reverse that judgment and remand to the district court for further proceedings consistent with this opinion.

## B. THE KU KLUX KLAN ACT CLAIM, § 1985(3)

The district court also granted summary judgment in favor of the defendants on Childree's Ku Klux Klan Act of 1871 claim, 42 U.S.C. § 1985(3). The elements of a cause of action under § 1985(3) are: (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Lucero v. Operation Rescue,* 954 F.2d 624, 627 (11th Cir.1992). The second element "requires a showing of some "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.' " *Id.* at 628 (quoting *United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 829, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983)); *see also Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 269, 113 S.Ct. 753, 759, 122 L.Ed.2d 34 (1993) (holding that whatever the precise meaning of "class" may be, it "unquestionably connotes

something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors.").

The district court held that Childree failed to establish the second element of her Klan Act claim, explaining that:

> Even assuming Section 1985(3) can be applied in some non-racial contexts, this Court finds that Plaintiff, as an alleged whistle-blower, is not a victim of some "otherwise class-based invidiously discriminatory animus.' The Court finds that "whistle-blowers' instead merely fall within *Bray's* "group of individuals who share a desire to engage in conduct the Section 1985(3) defendant disfavors.'

We agree. Although this Court has never addressed specifically whether whistleblowers are a protected class under § 1985(3), we repeatedly have declined to extend that section to apply in non-racial contexts. *See, e.g., Lucero,* 954 F.2d at 628 (refusing to apply § 1985(3) to protect women seeking abortions as a class); *McLellan v. Mississippi Power & Light Co.,* 545 F.2d 919, 933 (5th Cir.1977) (en banc) (refusing to apply § 1985(3) to protect bankrupts as a class); *cf. Burrell v. Board of Trustees of Ga. Military College,* 970 F.2d 785, 794 (11th Cir.1992) (noting that § 1985(3)'s "narrow intent requirement erects a significant hurdle for section 1985(3) plaintiffs."), *cert. denied,* 507 U.S. 1018, 113 S.Ct. 1814, 123 L.Ed.2d 445 (1993). To the best of our knowledge, no circuit court has ever held that whistleblowers are a protected class under § 1985(3), and some have expressly declined to do so. *See, e.g., Garrie v. James L. Gray, Inc.,* 912 F.2d 808, 813 (5th Cir.1990) (declining to extend § 1985(3) protection to whistleblowers), *cert. denied,* 499 U.S. 907, 111 S.Ct. 1108, 113 L.Ed.2d 218 (1991); *Buschi v. Kirven,* 775 F.2d 1240, 1258 (4th Cir.1985) (same). Indeed only one district court of which we are

aware has interpreted § 1985(3) to extend to whistleblowers. *See Lapin v. Taylor,* 475 F.Supp. 446 (D.Haw.1979).

We decline to apply § 1985(3) to protect whistleblowers as a class. Two types of classes come within § 1985(3)'s protection: (1) classes having common characteristics of an inherent nature—i.e., those kinds of classes offered special protection under the equal protection clause, and (2) classes that Congress was trying to protect when it enacted the Ku Klux Klan Act. *Kimble v. D.J. McDuffy, Inc.,* 648 F.2d 340, 347 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981). Whistleblowers simply do not fall under either type of class. *See, e.g., McLellan,* 545 F.2d at 932-33. The broad construction of § 1985(3) that Childree requests is inconsistent with the history and purpose of that provision, with our previous readings of it, and with the better reasoned precedent on the issue. Accordingly, we hold that the district court properly granted summary judgment to the defendants on the § 1985(3) claim.

### III. CONCLUSION

We AFFIRM the district court's grant of summary judgment on the Ku Klux Klan Act claim in favor of the defendants. We REVERSE the district court's grant of summary judgment in favor of the defendants on the whistleblower protection claim. We VACATE: the district court's denial of Childree's revised motion for leave to file an amended complaint; the court's denial as moot of ConAgra's motion seeking summary judgment on the grounds that it did not employ Childree; and the court's dismissal without prejudice of Childree's state law claim. We REMAND the case for further

proceedings consistent with this opinion.