Vladimir SHEKOYAN, Plaintiff,

v.

SIBLEY INTERNATIONAL CORP., Defendant.

Civil Action No. 00–2519(RBW).

United States District Court, District of Columbia.

March 19, 2004.

Vladmir Shekoyan, Washington, DC, Pro se.

Dawn V. Martin, Washington, DC, for Plaintiff.

Eric A. Dubelier, Laura Jean Ober-broeckling, Reed Smith, Washington, DC, for Defendant.

## MEMORANDUM OPINION

WALTON, District Judge.

This matter comes before the Court upon defendant Sibley International Corporation's ("Sibley") Motion for Summary Judgment ("Def.'s Mot."), following the issuance of this Court's August 16, 2002 Memorandum Opinion and Order dismissing the plaintiff's claims of discrimination on the basis of national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), *et seq.* (2000), and discrimination on the basis of national origin in violation of Presidential Executive Order ("E.O.") 11,246, Exec. Order No. 11,246, 30 Fed.Reg. 12,319 (Sept. 24, 1965). *Shekoyan v. Sibley Int'l Corp.*, 217 F.Supp.2d 59 (D.D.C.2002). The defendant now seeks summary judgment on the plaintiff's remaining claims of retaliatory termination of his employment in violation of the whistleblower provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h) (2000), discrimination on the basis of national origin in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C.Code §§ 2–1401.1–1403.17 (2001), and District of Columbia common law claims of breach of contract, defamation, and intentional infliction of emotional distress.[1] Upon consideration of the parties' submissions and for the reasons set forth below, the Court will grant the defendant summary judgment on the plaintiff's FCA claim and will dismiss the parties' District of Columbia claims pursuant to 28 U.S.C. § 1367.

## I.  *Background*

The plaintiff was born in Armenia and immigrated to the United States in 1994. Plaintiff's Statement of Undisputed Material Facts ("Pl.'s Facts") ¶ 1. In September 1997, the United States Agency for International Development ("USAID") awarded defendant Sibley International Corporation ("Sibley"), which is incorporated in Delaware and headquartered in the District of Columbia, "the task order for the Georgia Enterprise Accounting Reform ('GEAR') project[.]" Statement of Material Facts Not in Dispute ("Def.'s Facts") ¶¶ 1, 4. The defendant states that "[t]he purpose of the GEAR project, in general, was to assist with the transition from command to market accounting in the Republic of Georgia and develop enterprise market economy accounting and auditing practices in the Republic of Georgia." *Id.* ¶ 5. On January 26, 1998, the parties signed an employment contract and the plaintiff was hired as a "Senior Training Advisor" for the GEAR project. Pl.'s Facts ¶ 4. While the employment contract clearly indicates that the plaintiff's employment "will be for a period of twenty-one months beginning approximately January 26, 1998 and ending October 31, 1999" and that Sibley "believe[d] [the GEAR project] will be extended for an additional period of time[,]" Def.'s Facts, Exhibit ("Ex.") 6, the plaintiff asserts that Donna Sibley, the President of Sibley, "conveyed and anticipated that [p]laintiff's employment with Sibley [would] extend beyond the 21 months of the GEAR Project Task Order." Pl.'s Facts ¶ 6. In February of 1998, the plaintiff went to the Republic of Georgia to perform his job duties pursuant to the

---

1. The Court notes that the defendant has filed an Answer and Counterclaim to First Amended Complaint, in which it has asserted a claim of conversion and trespass to chattels against the plaintiff. *See* Answer and Counterclaim to First Amended Complaint at 11–12. However, the defendant has not requested summary judgment in its favor on these counterclaims.

agreement. *Id.* ¶ 18. In June of 1999, Jack Reynolds became employed by Sibley as "Chief of Party" of the GEAR Project in the Republic of Georgia. *Id.* ¶ 52. The plaintiff asserts that Reynolds "created a hostile work environment for [him], on the basis of his national origin, Armenian[.]" *Id.* ¶ 53. Reynolds is alleged to have "repeatedly told [p]laintiff, and other persons at his worksite, that [p]laintiff was not a 'real' American" and "constantly made derogatory and racist comments about Georgian people, as well as other people from the former Soviet Union." *Id.* ¶¶ 54–55. The plaintiff asserts that he repeatedly complained to Sibley's headquarters in the District of Columbia about the problems he was having with Reynolds. *Id.* ¶ 68. The plaintiff states that Gary Vanderhoof, who worked at headquarters, was informed about Reynolds' behavior, including the allegation that the plaintiff was deprived of access to GEAR Project vehicles. *Id.* The plaintiff also states that Vanderhoof told him "to work the problems out locally with Reynolds and said that headquarters was busy getting the project extended to receive additional funding from USAID." *Id.* ¶ 71.

The plaintiff also asserts that he "reported to Sibley officials in Washington, D.C.[ ] what he believed was the misuse of United States government funds on the GEAR Project." *Id.* ¶ 72. As the Court will discuss in detail below, the plaintiff believed that USAID funds were being misused by either Sibley employees or Sibley subcontractors. *Id.* ¶ 74. In October of 1999, the defendant asserts that it informed the plaintiff that his employment contract was scheduled to end on October 31, 1999. Def.'s Facts ¶ 21. The plaintiff contends, however, that he was terminated on October 14 or 15, 1999, after "Jack Reynolds shouted at [him], berated him, ordered him to immediately vacate the premises and barred him from the premises." Pl.'s Facts ¶ 77.

## II. *Standard of Review for Summary Judgment*

Summary Judgment is generally appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In assessing a summary judgment motion, the Supreme Court has explained that a trial court must look to the substantive law of the claims at issue to determine whether a fact is "material," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and must treat a "genuine issue" as "one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action," *Sanders v. Veneman,* 211 F.Supp.2d 10, 14 (D.D.C.2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

While it is understood that when considering a motion for summary judgment a court must "draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true," *Greene v. Amritsar Auto Servs. Co.,* 206 F.Supp.2d 4, 7 (D.D.C.2002) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505), the non-moving party must establish more than "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position," *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. To prevail on a summary judgment motion, the moving party must demonstrate that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. "Even when material facts are in dispute, however, summary adjudication may be appropriate if, with all factual inferences drawn in favor of the nonmovant, the movant would nonetheless be entitled to judgment as a matter of law." *Young Dental Mfg. Co. v. Q3 Special Prods., Inc.,* 112 F.3d 1137, 1141 (Fed.Cir.1997) (citing *Stark v. Advanced Magnetics, Inc.,* 29 F.3d 1570, 1572–73 (Fed.Cir.1994)). The District of Columbia Circuit has stated that the non-moving party may not rely solely on mere conclusory allegations. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993). Thus, "[i]f the evidence is merely colorable ..., or is not significantly probative ..., summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### III. *Analysis*

### (A) *The Plaintiff's False Claims Act "Whistleblower Provision" Claim*

As this Court explained in its August 16, 2002 Memorandum Opinion, the FCA contains a *qui tam* provision,[2] which permits "an individual (known as a relator) [to] bring a cause of action both on that person's behalf and on behalf of the government, thereby allowing the relator to share a portion of the proceeds derived from the recovery in a case." *Shekoyan,* 217 F.Supp.2d at 71 (quoting *Vermont Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 768–70, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000)). Of particular significance to this case is a 1986 amendment to the FCA that was enacted by Congress "in response to concern that

employees who exposed false claims were being punished by their companies[.]" *United States ex rel. Yesudian v. Howard Univ.,* 153 F.3d 731, 736 (D.C.Cir.1998). Section 3730(h) of the FCA, which is otherwise known as the whistleblower provision, provides that:

> [a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in any manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee ... in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole....

31 U.S.C. § 3730(h). The District of Columbia Circuit has stated that to make out a successful claim of retaliation under Section 3730(h), a plaintiff must demonstrate:

> (1) he engaged in protected activity, that is, 'acts done ... in furtherance of an action under this section'; and (2) he was discriminated against 'because of' that activity. To establish the second element, the employee must in turn make two further showings. The employee must show that: (a) 'the employer had knowledge the employee was engaged in protected activity'; and (b) 'the retaliation was motivated, at least in part, by the employee's engaging in [that] protected activity.'

*Yesudian,* 153 F.3d at 736 (quoting S.Rep. No. 99–345, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300). The defendant seeks summary judgment on the plaintiff's FCA claim because it asserts that the

---

**2.** *Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur. Vermont Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 769 n. 1, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). The English translation of this phrase means he "who pursues this action on our Lord the King's behalf as well as his own." *Id.*

plaintiff is unable to establish any of the elements of a FCA claim. Def.'s Mot., Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") at 16–26.

### (1) *Was the Plaintiff Engaged in Protected Activity in Furtherance of an FCA Action?*

■ The Whistleblower Provision of the FCA requires that the plaintiff be engaged in protected activity "in furtherance of an action under [the FCA], including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under [the FCA]." 31 U.S.C. § 3730(h). The *Yesudian* Court noted that it was "Congress' intent to protect employees while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together. Indeed, it is for this reason that courts have held employees' activities protected although they have not filed qui tam suits." 153 F.3d at 740.

■ For a plaintiff to be engaged in protected activity, it is "sufficient that [he] be investigating matters that 'reasonably could lead' to a viable False Claims Act case[,]" *id.*, or, in other words, engaged in "acts which carry a 'distinct possibility' of suit under the FCA." *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 515 (6th Cir.2000) (citations omitted). Of particular significance to this case, is the Sixth Circuit's statement in *McKenzie* that "case law indicates that 'protected activity' requires a nexus with the 'in furtherance of' prong of an FCA action." *Id.* (citing *Yesudian*, 153 F.3d at 740). The *McKenzie* Court commented that "[t]he legislative history [of the FCA] states that 'protection should extend not only to actual qui tam litigants, but those who assist or testify for the litigant, as well as those who assist the Government in bringing a false claims action. Protected activity should therefore be interpreted broadly.' " *Id.* at 514 (quoting S.Rep. No. 99–345, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300) (emphasis deleted). However, the Sixth Circuit was careful to point out that

> [t]he legislative history directive to 'broadly construe' the plaintiff's 'protected activity,' however, does not eliminate the necessity that the actions be reasonably connected to the FCA, which was designed to encourage and protect federal whistleblowers. The enumerated examples of 'protected activity' in § 3730(h)—'investigation for, initiation of, testimony for, or assistance in an action'—are not exhaustive; however, the 'protected activity' must relate to 'exposing fraud' or 'involvement with a false claims disclosure.'

*Id.* at 515 (citing S.Rep. No. 99–345, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300).

This Court is unable to conclude that the plaintiff has "raise[d] a genuine issue of material fact that [he was] engaged in 'protected activity,' defined as that activity which reasonably could lead to a viable FCA action." *Id.* at 516. A brief review of several cases that have confronted this issue is a necessary predicate to addressing whether the plaintiff in this case engaged in protected activity that was "reasonably connected to the FCA." *Id.* at 515. As this Court previously mentioned, the FCA's whistleblower provision extends beyond those circumstances in which the plaintiff has actually filed a qui tam suit. *Id.* at 514. Perhaps the most clear cut activity that is considered "protected conduct" in this regard is when a plaintiff formally investigates conduct by his employer, informs his employer that he intends to file a qui tam action, and is subsequently terminated. In *Eberhardt v. Integrated Design & Construction, Inc.*, 167 F.3d 861 (4th Cir.1999), the plaintiff initiated a qui tam action against his for-

mer employer under 31 U.S.C. § 3730(b)(1) for alleged false billing of the government in violation of the False Claims Act, 31 U.S.C. § 3729, and a retaliation claim pursuant to 31 U.S.C. § 3730(h). 167 F.3d at 864. In that case, prior to filing the qui tam action, the plaintiff led a formal investigation of the fraudulent billings accusations and, following the completion of this effort, had his salary reduced and his job restructured outside of his expertise. *Id.* at 865. The plaintiff then informed the employer that he was protected by the False Claims Act and indicated his intention to file a qui tam action. After declining to perform his newly assigned job duties, the plaintiff was terminated. *Id.* at 865–66. In *Eberhardt*, the Fourth Circuit found that the plaintiff had established a prima facie case of retaliation under section 3730(h), as his "acts constituted the 'initiation of . . . an action . . . to be filed [under the FCA],' [and thus the plaintiff] engaged in protected activity." *Id.* at 867 (quoting 31 U.S.C. § 3730(h)).

Despite what occurred in *Eberhardt*, it is clear that a plaintiff need not inform his employer that he is contemplating filing a qui tam action to come within the protection of section 3730. In the seminal case of *Yesudian*, the plaintiff, who was employed by Howard University,

> repeatedly advised [his supervisor's] superiors that he had evidence [that his supervisor] falsified time and attendance records, provided inside information to favored vendors to aid them in the bidding process, accepted bribes from vendors, permitted payments to vendors who did not provide services to the University, and took University property home for personal use.

153 F.3d at 740. The District of Columbia Circuit noted that a University

Vice President . . . asked [the plaintiff] to provide more specific information regarding these charges . . . so that they can be properly investigated. Yesudian collected evidence from other employees to corroborate the claim that [his supervisor's] assistant had not worked the days for which she received credit. He also took photographs of University property he believed [his supervisor] had taken for personal use. And he collected further documentation which he provided to [another] Vice President. . . .

*Id.* (internal quotation marks and citations omitted). The *Yesudian* Court concluded that "[t]here was more than enough evidence for a reasonable juror to conclude that [the plaintiff] was engaged in . . . an investigation" [of false or fraudulent claims]. *Id.* In *Childree v. UAP/GA AG Chem, Inc.*, 92 F.3d 1140 (11th Cir.1996), the plaintiff testified under a subpoena at a Department of Agriculture ("DOA") hearing about a fraudulent billing scheme involving her employer. *Id.* at 1143. Following this testimony, the plaintiff's employment was terminated because she had removed confidential customer files that related to the billing scheme and were produced by the plaintiff at the DOA hearing. *Id.* While the plaintiff conceded that she had never anticipated filing a qui tam action, the Eleventh Circuit found that summary judgment should not have been granted for the plaintiff's former employer because the filing of a FCA claim by the government was "a distinct possibility" when the plaintiff gave her testimony about the fraudulent billing scheme. *Id.* at 1146. In *Neal v. Honeywell, Inc.*, 33 F.3d 860 (7th Cir.1994), the plaintiff became aware that her co-workers were falsifying ammunition test data and "told Honeywell's legal counsel, who immediately notified the Army and commenced an investigation." *Id.* at 861. The Seventh

Circuit found that section 3730(h) "expressly covers investigatory activities preceding litigation. What [the plaintiff] did, supplying information that set off an investigation, fits comfortably into this category." *Id.*

However, courts have drawn the line at what is considered "protected activity" when it comes to a plaintiff simply reporting concerns to a supervisor, finding that in such circumstances the plaintiff is not acting "in furtherance of" a qui tam action. *McKenzie*, 219 F.3d at 515. In *Zahodnick v. International Business Machines Corp.*, 135 F.3d 911 (4th Cir.1997) (per curiam), the plaintiff reported to his supervisor that other employees were billing their work on a project with the Defense Intelligence Agency to the wrong account. *Id.* at 913. The plaintiff asserted that following this report to his supervisor, "he began receiving negative treatment . . ." in several respects from his employer. *Id.* The Fourth Circuit found that the plaintiff did not take acts "in furtherance of a quit tam suit" as

> the record disclose[d] that [he] merely informed a supervisor of the problem and sought confirmation that a correction was made; he never informed anyone that he was pursuing a qui tam action. Simply reporting his concern of a mischarging to the government to his supervisor does not suffice to establish that Zahodnick was acting 'in furtherance of' a qui tam action.

*Id.* at 914. In *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176 (3d Cir.2001), a partner at a law firm asked the plaintiff, a paralegal, "to investigate certain client bills, with particular attention to the 'high cost' of certain computerized research." *Id.* at 179–80. After completing his investigation, the plaintiff submitted a memorandum detailing his concerns about the firm's billing practices. Approximately one month later, the plaintiff was termi-

nated based on the law firm's belief that he was the author of an anonymous disparaging memorandum that had been circulated about another paralegal. *Id.* at 180. Following his termination, the plaintiff notified the United States Bankruptcy Trustee "by sworn affidavit" that he believed the law firm was engaged in unlawful billing practices when it submitted fraudulent legal bills for approval to the United States Bankruptcy Court. *Id.* at 181. The plaintiff subsequently filed both a qui tam and a retaliation claim. *Id.* The district court granted summary judgment to the defendant law firm because it found that the plaintiff had failed to engage in "protected conduct" as his actions were merely the product of an assignment that he was given by the firm. *Id.* at 186–87. In part, the district court found that the "investigation and reporting of the . . . billing practice was not 'protected conduct' because, . . . [i]t was not the result of plaintiff's independent investigation prompted by a suspicion of fraud upon the government." *Id.* at 186–87 (citation omitted). In affirming the district court, the Third Circuit noted that "[d]etermining what activities constitute 'protected conduct' is a fact specific inquiry. . . . Under the appropriate set of facts, these activities can include internal reporting and investigation of an employer's false or fraudulent claims." *Id.* The Circuit Court in *Hutchins* also commented that the plaintiff

> never threatened to report his discovery . . . to a governmental authority, nor did he file a False Claims Act suit until after he was terminated. Furthermore, [he] never informed his supervisors he believed this billing practice was 'illegal,' or that the practice was fraudulently causing government funds to be lost or spent. Nor did he advise his employer that corporate counsel be involved in the matter.

*Id.* at 193 (internal citations omitted). In *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, the plaintiff claimed that "she engaged in protected activity when she informed supervisors, union stewards, and BellSouth auditors about the falsification of repair records." The Sixth Circuit concluded that "[a]lthough internal reporting may constitute protected activity, the internal reports must allege fraud on the government." *Id.* at 516. The *McKenzie* Court found in that case that "legal action was not a reasonable or distinct possibility . . . [as] the 'in furtherance of' language requires more than merely reporting wrongdoing to supervisors." *Id.* Notably, the Sixth Circuit concluded that the plaintiff's "numerous complaints on the matter were directed at the stress from and pressure to falsify records, not toward an investigation into fraud on the federal government." *Id.* at 517. In *Yesudian,* the District of Columbia Circuit stated that it is

> sufficient that a plaintiff be investigating matters that 'reasonably could lead' to a viable False Claims Act case. Mere dissatisfaction with one's treatment on the job is not, of course, enough. Nor is an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations. To be covered by the False Claims Act, the plaintiff's investigation must concern 'false or fraudulent' claims.

153 F.3d at 740 (internal citations omitted).

Plaintiffs who alert supervisors about improprieties simply in an attempt to have the employer comply with federal regulations also have failed to engage in "protected activity." In *Brandon v. Anesthesia & Pain Management Associates, Ltd.,* 277 F.3d 936 (7th Cir.2002), the plaintiff notified shareholders of the defendant that he was concerned about their medicare billing practices and contacted Medicare

for information about their billing rules. *Id.* at 944. The Seventh Circuit found that while the plaintiff "used terms like 'illegal,' 'improper,' and 'fraudulent' when he confronted the shareholders about the billing practices[,]" his conduct was not protected under the FCA because he "was simply trying to convince the shareholders to comply with the Medicare billing regulations." *Id.* at 944–45. The *Brandon* Court noted that the plaintiff "never explicitly told the shareholders that he believed they were violating the FCA and had never threatened to bring a qui tam action. He never threatened to report their conduct to the government until after he was discharged." *Id.* In *United States ex rel. Ramseyer v. Century Healthcare Corp.,* 90 F.3d 1514 (10th Cir.1996), the plaintiff "regularly communicated to her superiors '[i]nformation regarding noncompliance with the required minimum program components [of Medicare].'" *Id.* at 1522–23. The Tenth Circuit noted that the "plaintiff never suggested to defendants that she intended to utilize such noncompliance in furtherance of an FCA action. Plaintiff gave no suggestion that she was going to report such noncompliance to government officials, nor did she provide any indication that she was contemplating her own qui tam action." *Id.* at 1523 (internal citation omitted). Rather, the *Ramseyer* Court observed, the plaintiff's complaints fell within her job duties and thus failed to put the defendants "on notice that she was acting 'in furtherance of' an FCA action[.]" *Id.* at 1523.

Here, the plaintiff asserts in his deposition that he reported numerous transgressions to Sibley officials. His first allegation was that Jack Reynolds and his wife purportedly used Project vehicles, Project staff members, and Project resources that were paid for with USAID money for personal purposes. Plaintiff's Opposition to Defendant's Motion for Summary Judg-

ment ("Pl.'s Opp'n"), Plaintiff's Exhibit List, Exhibit ("Ex.") G (Plaintiff's deposition testimony) at 183. The basis for his complaints to his superiors regarding Jack Reynolds' "use [of] project cars for his wife, for his shopping, for his gas tank, and for some other things," was because the plaintiff was apparently denied the use of such vehicles and not that the conduct was fraudulent. *Id.* Second, the plaintiff also alleged that a mini-typographic machine was improperly purchased for the Georgian Federation of Professional Accountants and Auditors ("GFPAA") at an inflated price, and used to print both political and commercial literature. *Id.* at p. 188. The plaintiff states that when he informed Reynolds that he could get the machine for a cheaper price, "Reynolds said, okay, I cannot deal with this right now. When I come back, we will talk about this." *Id.* However, when Reynolds returned, there was no further discussion and he authorized the purchase of the machine. *Id.* The Court notes that the plaintiff explained during his deposition that the crux of his claim regarding the purchase of this machine is Sibley's representation to the USAID that "it was [acquired through an] open and fair bidding process." *Id.* at 189. The plaintiff stated that the USAID's policy required three bids from different companies and that Sibley had falsely stated to the USAID that it received three bids when it really only received one bid. *Id.* at 189–192. The plaintiff, along with a co-worker, apparently sent this information to Sibley headquarters in the District of Columbia, and they were informed that a final decision was not going to be made until Reynolds arrived. *Id.* at 187. However, as indicated above, Reynolds never addressed the situation. *Id.* at 188. The plaintiff's third allegation is that the GFPAA leased three separate offices throughout the Republic of Georgia with USAID funding from Sibley and that the

offices were located either in a private residence, in the building of a local government, or in a private business. *Id.* at 207. Between June and July of 1999, the plaintiff conducted training in the areas of Batumi City, Kakheti, and the Poti region. *Id.* at 207–221. During these training visits, he learned that the GFPAA office in Batumi was actually the apartment of the individual in charge of that office, *id.* at 211, the "address that [the] head of [the] Kakheti branch was claiming as [his] office, ... was not his private residence, but it was in the building of [a] local government[,]" *id.* at 214–15, and the office in the Poti region was located where the person in charge of that office had his consulting firm. *Id.* at 219. When he returned from these training visits, the plaintiff states that he asked Jack Reynolds if Sibley was paying for these offices. *Id.* at 211–12. Reynolds told the plaintiff that Sibley was renting the offices and for him not to worry about them. *Id.* at 212, 216–17, 220. The fourth allegation is that the branch heads at each of the above locations were employed by GFPAA at the same time they were full-time employees of other organizations. *Id.* at 220–22. The plaintiff stated that he informed Gary Vanderhoof about the dual employment, who in turn asked whether the plaintiff had informed Jack Reynolds about this situation. *Id.* at 222. When the plaintiff indicated that he had informed Reynolds, Vanderhoof stated "okay, then he'll take it from there." *Id.* The last allegation discussed by the plaintiff in his deposition testimony is that Sibley indicated on documents submitted to the USAID that the chairman and two deputy chairmen of GFPAA were actually being paid more than what was being reported. *Id.* at 198. The plaintiff stated that Sibley did this because the the USAID would be "a little upset because [the] project had spent a lot of money, but results [were] not adequate." *Id.* The

plaintiff indicated that he asked Gary Vanderhoof why Sibley only reported half of these individuals' salaries to USAID and was told "don't get involved." *Id.*

The plaintiff was asked during his deposition whether he reported any of these incidents to the USAID. *Id.* at 217. He acknowledged that he never contacted the USAID, but stated that Sibley employees were instructed not to contact the USAID directly "on any issues other than issues related to [their] specific area of activities or on issues [they were] authorized to contact USAID in advance." *Id.* at 217–18. The plaintiff testified that after he made the above inquiries, "eventually Gary [Vanderhoof] told me, Shekoyan, don't make too much noise. Let us finish with this [contract] extension [with the USAID] and [the] new project and then we will deal with whatever issues you have to deal with." *Id.* at 224–25. The plaintiff was then asked during his deposition: "But you were concerned enough about it that you made noise about it, you complained about it, right, because you thought that these people were stealing money, money that they weren't entitled to?" *Id.* at 225. In response to this question, the plaintiff answered, "[t]his is your conclusion. What I thought was that something inappropriate is taking place. We have to either shed light on it to find out what's really going on or just—[.]" *Id.* The defendant's attorney later asked, "[a]nd you had concluded, I gather, by sometime in the mid 1999 that there was corruption in connection with the GEAR project?" *Id.* at 228. The plaintiff's response to this question is particularly significant, because he stated:

> Absolutely no. I do not agree with this statement. I have never concluded that there was a corruption. I thought that there are some issues that need to be kind of addressed or corrected or fixed

or. I don't know, worked out, but I did not conclude that there was a corruption.

*Id.*

In *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730 (7th Cir.1999), the Seventh Circuit noted that "[a]n employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation." *Id.* at 733. Thus, in *Hutchins*, the Third Circuit found that the plaintiff's complaints to his supervisor about the firm's billing policy was a "suggestion for improvement . . . rather than a precursor to litigation[,]" *Luckey*, 183 F.3d at 733, as Hutchins never informed his supervisor "that he thought the practice was illegal or fraudulently causing loss of government funds." 253 F.3d at 193. The *Hutchins* Court found the circumstances in that case similar to those in *Zahodnick*, where the plaintiff there "merely informed a supervisor of a problem and sought confirmation that a correction was made." *Hutchins*, 253 F.3d at 193 (quoting *Zahodnick*, 135 F.3d at 914). Similarly, many courts have found that internal reports in which a plaintiff sought to have his employer comply with federal or state regulations do not fall within the scope of the FCA. *See McKenzie*, 219 F.3d at 516; *Yesudian*, 153 F.3d at 743.

In this case, the Court is simply unable to find that the plaintiff has raised a genuine issue of material fact concerning whether he engaged in "protected activity" in furtherance of a viable FCA action. Rather, all of the plaintiff's complaints to his supervisors constituted suggestions designed to improve or benefit Sibley. Even in his amended complaint, the plaintiff states that he "was a dedicated employee of Sibley International who wanted to cure the defects in the company caused by mal-

feasors, but not to destroy the company." First Amended Complaint at ¶ 69. The plaintiff simply made internal inquiries or complaints to his supervisors about his concerns, and he was adamant during his deposition that he had never concluded that Sibley was involved in corruption. Pl.'s Opp'n, Ex. G at 228. It is clear from the record that there was no "nexus" between the plaintiff's inquiries and complaints and the " 'in furtherance' prong of an FCA action" when the acts the plaintiff contends constituted "protected activities" occurred. *McKenzie*, 219 F.3d at 515. In *McKenzie*, the Sixth Circuit concluded that the plaintiff's "numerous complaints on the matter were directed at the stress from and pressure to falsify records, not towards an investigation into fraud on the federal government." 219 F.3d at 517. Similarly, here the plaintiff's deposition testimony indicates that his inquiries and complaints were designed to bring to the attention of his employer "issues that need[ed] to be ... addressed or corrected or fixed or ... worked out ..." in the absence of a belief on plaintiff's part "that there was ... corruption" occurring. Pl.'s Opp'n, Ex. G at 228. As such, the plaintiff's actions were not "reasonably connected to the FCA, which was designed to encourage and protect federal whistleblowers[,]" *McKenzie*, 219 F.3d at 515 (citing S.Rep. No. 99–345, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300 ("encouraging those that 'may be considering exposing fraud ... [by protecting them] from retaliatory acts' ")), but were merely efforts to alert Sibley about possible improprieties. Accordingly, the Court finds that the plaintiff has failed to establish that he was engaged in "protected activity" under the FCA.

### (2) *Was the Defendant's Alleged Retaliation Motivated by the Plaintiff's Participation in Protected Activity?*

■ Even if the plaintiff could establish that he engaged in protected activity in furtherance of an FCA action, the Court would nonetheless have to find that he has failed to establish that he suffered an adverse employment action "because of activities which the employer had reason to believe were taken in contemplation of a qui tam action against the employer." *McKenzie*, 219 F.3d at 518 (emphasis omitted). The *McKenzie* Court noted that "[t]he FCA's legislative history states that the employee must show that 'the retaliation was motivated at least in part by the employee's engaging in protected activity.' " *Id.* (quoting S.Rep. No. 99–345, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300); *see Yesudian*, 153 F.3d at 736 (same). In *Karvelas v. Melrose Wakefield Hospital*, 360 F.3d 220 (1st Cir.2004), the First Circuit recently commented that "in order to state a claim for retaliation, [a plaintiff] must also allege that he was terminated *because* of his protected conduct." *Id.* at 239–40. In that case, in which the district court had granted the defendant's motion to dismiss, the *Karvelas* Court found that the plaintiff had failed to satisfy his pleading requirements because "[n]owhere in his complaint does [he] allege a factual predicate concrete enough to support his conclusory statement that he was retaliated against because of conduct protected under the FCA." *Id.* Here, after allowing the plaintiff to file an amended complaint to conform with Federal Rule of Civil Procedure 9(b),[3] there is nothing in the record to support the plaintiff's claim that he was terminated because of his

---

**3.** The Court notes that in its August 16, 2002 Memorandum Opinion and Order, it denied the defendant's motion to dismiss the plain-

tiff's FCA claim, instead permitting the plaintiff to file an amended complaint so he could comply with Fed.R.Civ.P. 9(b).

participation in protected activity under the FCA. The plaintiff states in a conclusory fashion in his amended complaint that "[i]n return for his efforts to eradicate corruption and protect Sibley International from liability, he was fired. Plaintiff Shekoyan's termination was, in part, effected in retaliation for his reporting violations of the False Claims Act, 31 U.S.C. Section 3729." Am. Compl. at ¶¶ 72–73. And, in his opposition to the defendant's summary judgment motion, he fails to even address this element of the section 3730(h) prima facie case. *See* Pl.'s Opp'n at 28–31. Thus, there is nothing in the record to establish that the plaintiff has raised a genuine issue of material fact that he suffered an adverse employment action as a result of engaging in any protected activity in furtherance of an FCA action. Accordingly, the Court finds that the plaintiff has failed to establish that he suffered an adverse employment action "because of activities which the employer had reason to believe were taken in contemplation of a qui tam action against the employer." *McKenzie*, 219 F.3d at 518 (emphasis omitted). The defendant's request for summary judgment on the plaintiff's FCA section 3730(h) retaliation claim will therefore be granted.[4]

**(B)** *The District of Columbia Claims*

■ With the Court's grant of summary judgment on the plaintiff's FCA claim, the only remaining claims asserted by the plaintiff are his claim of discriminatory termination of his employment because of his national origin in violation of the DCHRA, D.C.Code §§ 2–1401.1–1403.17

(2001), and the District of Columbia common law claims of breach of contract, defamation, and intentional infliction of emotional distress. *See* Am. Compl. ¶¶ 21–67, 74–90. 28 U.S.C. § 1367 states that

in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). The Court's supplemental jurisdiction was the reason it declined to dismiss these claims in its August 16, 2002 Memorandum Opinion. *See Shekoyan*, 217 F.Supp.2d at 75–76. However, that ruling was dependent on the existence of a viable federal claim. Now that the plaintiff's FCA claim has been dismissed, all of the plaintiff's federal claims are out of the picture. Therefore, the Court will decline to further exercise supplemental jurisdiction over the plaintiff's District of Columbia claims. 28 U.S.C. § 1367(c) states that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3); *see Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1043 (D.C.Cir.2003) (affirming district court's dismissal under 28 U.S.C. § 1367 of the pendent District of Columbia law claims "where all of the federal claims were properly resolved against [the plaintiff]"). Critical to the Court's decision to

---

4. As this Court discusses above, to establish a prima facie case under section 3730(h), a plaintiff must prove: (1) that he engaged in protected activity in furtherance of an FCA action, (2) that the employer knew about it, and (3) that the employer retaliated against the plaintiff for participating in this protected activity. *McKenzie*, 219 F.3d at 514; *Yesudi-*

an, 153 F.3d at 736. Because the Court finds that the plaintiff has failed to establish that he engaged in protected activity in furtherance of an FCA action and that the defendant retaliated against him because of such conduct, the Court need not address whether the employer was aware of the plaintiff's conduct.

dismiss the non-federal claims is 28 U.S.C. § 1367(d), which provides that the period of limitations for any of these District of Columbia law claims "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d); *see Neal v. District of Columbia*, 131 F.3d 172, 175 n. 5 (D.C.Cir. 1997) (quoting 28 U.S.C. § 1367(d)) (noting that "[d]ismissals for lack of supplemental jurisdiction are without prejudice, and the limitations period for a claim dismissed for this reason is tolled 'while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.' "). Thus, applicable statutes of limitations will not adversely impact plaintiff's ability to pursue his District of Columbia claims in the local court system. Finally, the Court will also dismiss the defendant's counterclaim for conversion and trespass to chattels pursuant to 28 U.S.C. § 1367(c), which may also be pursued in the local court system.

## IV. *Conclusion*

For the reasons set forth above, this Court will grant summary judgment to the defendant on the plaintiff's FCA claim, as the plaintiff has failed to establish a prima facie case of conduct protected by 31 U.S.C. § 3730(h), and this claim will therefore be dismissed. In addition, pursuant to 28 U.S.C. § 1367(c), the Court will dismiss the defendant's counterclaim for conversion and trespass to chattels and the plaintiff's DCHRA, breach of contract, defamation, and intentional infliction of emotional distress claims.[5]

**SO ORDERED** this 19th day of March, 2004.

---

5. An Order consistent with the Court's ruling accompanies this Memorandum Opinion.