# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 15, 2005        Decided June 3, 2005

No. 04-7040

VLADIMIR SHEKOYAN,
APPELLANT

v.

SIBLEY INTERNATIONAL,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 00cv02519)

———

*Dawn V. Martin* argued the cause for the appellant.

*Kathy M. Banke* argued the cause for the appellee. *Laura J. Oberbroeckling* was on brief.

Before: SENTELLE, HENDERSON and ROGERS, *Circuit Judges*.

Opinion filed for the court by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Vladimir Shekoyan, a lawful permanent resident of the United States

during all times relevant to this case, filed a suit against his former employer, Sibley International, alleging employment discrimination under Title VII of the Civil Rights Act of 1984 (Title VII), 42 U.S.C. §§ 2000e *et seq.*, and retaliation under the False Claims Act (FCA), 31 U.S.C. §§ 3729–3733. Shekoyan also asserted state tort and breach of contract claims whose merits are not before us. The district court dismissed Shekoyan's Title VII claim for lack of subject matter jurisdiction, *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59 (D.D.C. 2002). The court subsequently granted summary judgment in favor of Sibley on the FCA claim while dismissing Shekoyan's pendent state law claims for lack of supplemental jurisdiction. *Shekoyan v. Sibley Int'l Corp.*, 309 F. Supp. 2d 9 (D.D.C. 2004). Shekoyan appeals these rulings, as well as two unpublished orders issued by the district court related to Shekoyan's attempt to submit non-standard affidavits in opposition to Sibley's motion for summary judgment. Because the district court correctly interpreted Title VII not to apply to an alien employed outside the United States and properly applied the summary judgment standard in finding for Sibley on Shekoyan's FCA claim, we affirm the judgment of the district court.

## I.

Vladimir Shekoyan immigrated to the United States from his native Armenia in 1994 and was granted "lawful permanent resident" (LPR) status in 1996.[1] Shekoyan has a Ph. D. in Finance and Economics from the University of Moscow and has worked for Armenia's Ministry of Economics as well as for the

---

[1] The Immigration and Nationality Act (INA) imposes a five-year waiting period after acquiring LPR status before an alien may apply for U.S. citizenship. 8 U.S.C. § 1427(a). Shekoyan applied for citizenship in 2001 and became a naturalized American citizen in January 2003.

World Bank. Sibley International is a consulting firm headquartered in Washington, D.C. that "assists foreign governments in implementing accounting reform." Def.'s Statement of Material Facts Not in Dispute, Case No. 00-2519 (Apr. 28, 2003).

This lawsuit stems from Shekoyan's employment with Sibley from January 1998 until October 1999. Shekoyan was hired as a "Training Advisor" on the Georgia Enterprise Accounting Reform (GEAR) project for which Sibley had been awarded a contract (called a "task order") by the U.S. Agency for International Development (USAID). The parties signed an employment letter contract that spelled out a 21-month term of employment with the "hope that this will be the beginning of a longer association."[2] The contract stated Shekoyan's place of employment as "Tbilisi, Republic of Georgia," and noted his eligibility for "USAID benefits for long-term personnel living in Georgia." Shekoyan claims that Sibley "committed to maintaining its employment relationship with [him] beyond the 21-month contract" and that he was to "be employed by Sibley back in Washington, D.C." This claim is disputed by Donna Sibley, the president of Sibley International, who stated in her deposition that Shekoyan's employment beyond the GEAR project was never discussed in more definite terms than the "hope" expressed in the employment contract.

The hoped-for ongoing relationship never came about. Despite a second USAID task order for Sibley to continue the GEAR project, Shekoyan was terminated as of October 31, 1999—the end date of the original task order. The letter of termination, dated October 20, 1999 and sent to Shekoyan's

---

[2] The copy of the letter contract dated January 15, 1998 contained in the Exhibits to the Joint Appendix is not signed by Shekoyan but the parties do not dispute that the text of the letter constitutes a valid employment contract.

Washington, D.C. residence, cites "a change in staffing requirements" as the reason Shekoyan was not rehired. According to Sibley's brief, the available positions under the new task order required a degree in public accounting, which Shekoyan did not have.

Shekoyan tells a different story. He claims that his working relationship with his immediate supervisor Jack Reynolds deteriorated as a result of Reynolds's discrimination based on Shekoyan's national origin. Shekoyan claims that Reynolds made statements that Shekoyan was not a "real American," mocked his accented English and made racist comments about people from former Soviet states. Shekoyan also alleges financial misconduct by Sibley staff on the GEAR project, including use of the offices and equipment paid for by USAID to run a private audit practice, payment of full time salaries to individuals who were employed full time by other organizations, use of resources supplied by USAID to develop unrelated business for Sibley and diversion of project vehicles and staff members by Jack Reynolds and his wife for personal tasks. Shekoyan claims to have alerted his superiors at Sibley in Washington regarding Reynolds's harassment and misuse of project resources—a claim Sibley denies—and that, as a result, he was fired for insubordination rather than because of any change in staffing requirements.

Shekoyan filed a lawsuit in federal district court on October 20, 2000 alleging: discrimination on the basis of national origin, a violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*, and the District of Columbia Human Rights Act (DCHRA), D.C. Code § 2-1402.11; retaliation for his investigation into the misuse of federal funds by GEAR employees in violation of the FCA, 31 U.S.C. §§ 3729–3733; and other state law torts and breaches of contract. Sibley moved to dismiss Shekoyan's Title VII claim under FED. R. CIV. P. 12(b)(1) on the ground that Title VII protections do not extend to non-U.S. citizens working abroad

and to dismiss his FCA claim under FED. R. CIV. P. 12(b)(6) for failure to allege facts sufficient to make out a whistleblower claim. Sibley also moved to dismiss the pendent state law claims for lack of supplemental jurisdiction. The district court granted Sibley's motion to dismiss the Title VII claim, finding that because "the plaintiff is a permanent resident alien, who was employed extraterritorially, he is outside the scope of the protections of Title VII." *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 68 (D.D.C. 2002) (*Shekoyan I*). Accordingly, the district court held that it lacked subject matter jurisdiction over the Title VII claim. *Id*. Turning to Shekoyan's FCA claim, the district court found that the complaint, which had been filed *pro se*, failed to satisfy FED. R. CIV. P. 9(b), which requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Shekoyan I*, 217 F. Supp. 2d at 73. Nevertheless, the district court granted Shekoyan leave to amend his complaint because "'leave to amend is "almost always" allowed to cure deficiencies in pleading fraud.'" *Id*. at 74 (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (in turn quoting *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1988))). Moreover, in Shekoyan's opposition to Sibley's motion to dismiss, he set forth 22 instances of fraud, leaving the court unable to "'say with assurance that … it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Shekoyan I*, 217 F. Supp. 2d at 75 (quoting *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (internal quotation omitted) (omission in *Shekoyan I*). Because Shekoyan's state law claims derived from the same "common nucleus of operative fact," *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966), as his FCA claim, the district court chose to exercise supplemental jurisdiction and denied Sibley's motion to dismiss those claims. *Shekoyan I*, 217 F. Supp. 2d at 75–76.

Shekoyan filed his first amended complaint on September 2, 2002 with the assistance of counsel. Sibley filed an answer denying all wrongdoing and a counterclaim for the value of certain equipment it alleged Shekoyan took from the GEAR project site. Following discovery, on April 28, 2003, Sibley moved for summary judgment on Shekoyan's FCA claim. As part of the filing in opposition, Shekoyan's lawyer signed and submitted an unnotarized "affidavit" that recounts the purported substance of her telephone interviews with former Sibley employees, including Sibley's former Chief Financial Officer, David Bose. Shekoyan's filing also included an unsigned draft declaration by Gary Vanderhoof, a former Vice President and Project Advisor at Sibley, corroborating Shekoyan's version of events on the GEAR project. Sibley challenged the accuracy of the affidavit and draft declaration and moved to strike both. In support, Sibley submitted signed, notarized affidavits by Bose and Vanderhoof stating that Shekoyan's lawyer had misrepresented their conversations and that they could not substantiate any harassment claims. Sibley also pointed to the transcript of the telephone conversation between Shekoyan's lawyer and Bose, which in several places had Bose denying any knowledge of harassment before Shekoyan's return to the United States. Shekoyan countered with a Rule 11 motion for sanctions against Sibley's lawyers. The district court denied Shekoyan's Rule 11 motion and granted Sibley's motion to strike in part, striking from the record the unnotarized affidavit of Shekoyan's lawyer and the unsigned Vanderhoof declaration.

While the dispute over Shekoyan's submissions in opposition to Sibley's motion for summary judgment was playing out, on January 30, 2004, Shekoyan moved to file his own motion for summary judgment out of time. In an unpublished order dated February 3, 2004, the district court denied the request, noting that all dispositive motions were required—per court order—to be filed by April 28, 2003. On March 19, 2004, the district

court granted Sibley's motion for summary judgment and dismissed Shekoyan's remaining state law claims and Sibley's remaining counterclaims. *Shekoyan v. Sibley Int'l Corp.*, 309 F. Supp. 2d 9, 22 (D.D.C. 2004) (*Shekoyan II*). The district court found that Shekoyan failed to raise "a genuine issue as to any material fact," FED. R. CIV. P. 56(c), because he could show neither that he was engaged in "protected activity" nor that he had suffered an adverse employment action as a result thereof. *Shekoyan II*, 309 F. Supp. 2d at 14, 20. Having disposed of the last of Shekoyan's federal claims, the district court declined to exercise jurisdiction over the remaining District of Columbia claims, noting that 28 U.S.C. § 1367(d) provides for the tolling of a state's statute of limitations when a federal court exercises supplemental jurisdiction over state claims and concluding, therefore, that dismissing the claims "will not adversely impact plaintiff's ability to pursue his District of Columbia claims in the local court system." *Shekoyan II*, 309 F. Supp. 2d at 22.

Shekoyan timely filed his notice of appeal on April 6, 2004. Pursuant to the district court's order in *Shekoyan II*, Shekoyan filed his state and common law claims in the District of Columbia Superior Court. *Shekoyan v. Sibley Int'l Corp.*, C.A. No. 04-0002980 (D.C. Sup. Ct. 2004). Those proceedings are stayed pending the outcome of this appeal.

II.

A. *The Title VII Claim*

Title VII of the Civil Rights Act of 1964 prohibits discrimination in employment based on, *inter alia*, race or national origin. Title VII provides that "[i]t shall be an unlawful employment practice for an employer … to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual … because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). An "employee" is defined by Title VII, in circular fashion, as

"an individual employed by an employer." *Id*. § 2000e(f). The parties do not dispute that Shekoyan was "employed" by Sibley International nor do they dispute that Sibley meets the statutory definition of an "employer." *See id*. § 2000e(b).

Shekoyan contends that the district court erred in two ways in dismissing his Title VII claim for lack of subject matter jurisdiction: first, by holding that Title VII does not extend to a non-U.S. citizen employed overseas; and second, by holding that, for Title VII purposes, Shekoyan's place of employment was the Republic of Georgia rather than the United States. *Shekoyan I*, 217 F. Supp. 2d at 67–68. We review *de novo* a district court's dismissal of a claim under FED. R. CIV. P. 12(b)(1). *Macharia v. United States*, 334 F.3d 61, 64 (D.C. Cir. 2003).

The United States Supreme Court took up the issue of Title VII's extraterritorial application in *Equal Employment Opportunity Comm'n v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) (*ARAMCO*). In *ARAMCO*, the Court held that the protections of Title VII do not extend to citizens employed by U.S. companies overseas. It relied on the "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Id*. at 248 (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). It explained that because the Court "assume[s] that Congress legislates against the backdrop of the presumption against extraterritoriality," it will not read extraterritorial jurisdiction into a statute "unless there is the affirmative intention of the Congress clearly expressed." *Id*. (internal quotation marks omitted). If the statutory language is "ambiguous" or "does not speak directly to the question presented," the Court will not infer

extraterritorial jurisdiction. *Id*. at 250.[3] The Court thus concluded that "Congress' awareness of the need to make a clear statement that a statue applies overseas" combined with its use of "more limited, boilerplate … language" manifested that the Congress never "intended Title VII to apply abroad." *Id*. at 252, 258-59.

In response to *ARAMCO*, the Congress amended Title VII to extend its protections to U.S. citizens working overseas. The statute now reads: "With respect to employment in a foreign

---

[3] Shekoyan argues that the presumption against extraterritoriality should not apply here because "the interests of the U.S. are clearly affected by the assertion of Title VII jurisdiction over Sibley." Pet'r Br. at 22. In support he cites *Envt'l Def. Fund, Inc. v. Massey*, 986 F.2d 528 (D.C. Cir. 1993), which involved the extraterritorial application of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, to a federal agency, the National Science Foundation for failing to prepare an Environmental Impact Statement (EIS) before incinerating food waste in Antartica. 986 F.2d at 529. In *Massey*, we first noted that the presumption against extraterritoriality "is generally not applied where the failure to extend the scope of the statute to a foreign setting will result in adverse effects within the United States." *Id*. at 531. The court named U.S. antitrust law, 15 U.S.C. §§ 1 *et seq.*, and trademark law, 15 U.S.C. §§ 1051 *et seq.*, as examples of statutes enforced extraterritorially in order to avoid "negative economic consequences" domestically. *Massey*, 986 F.2d at 531. Shekoyan lists lost tax revenues to the federal government as well as the cost of unemployment benefits paid to him as sufficient adverse consequences to negate the presumption of territoriality. But *Massey* was not decided on the "adverse consequences" exception. Rather, the court found that "[b]ecause the decisionmaking processes of federal agencies take place almost exclusively in this country and involve the workings of the United States government, they are uniquely domestic." *Id*. at 532 (citation omitted). Moreover, the *Massey* court expressly noted that the presumption against extraterritoriality *did* apply to Title VII. *Id*. at 533 (citing *ARAMCO*, 499 U.S. at 255).

country," the term "employee" "includes an individual who is a citizen of the United States," 42 U.S.C. § 2000e-1(f). The Congress also retained section 2000e-1(a), which specifies that Title VII does not apply "to an employer with respect to the employment of aliens outside any State." *Id*. § 2000e-1(a). Shekoyan argues that his LPR status makes him a U.S. national, thereby placing him in statutory limbo between a protected citizen and an excluded alien. Pet'r Br. at 11. Shekoyan relies on the Immigration and Nationality Act, 8 U.S.C. § 1101, which defines "alien" to include "any person not a citizen or national of the United States," *id*. § 1101(a)(3), to support his interpretation that a national should not fall within Title VII's "alien" exclusion for overseas employees. Yet even assuming, *arguendo*, that a lawful permanent resident qualifies as a U.S. national—a matter the parties dispute—Shekoyan faces a significant problem: Title VII does more than merely exclude an alien employed overseas from protection; it affirmatively grants protection only to "a citizen of the United States." 42 U.S.C. § 2000e(f). Especially in light of the presumption against extraterritoriality, the Congress's express language extending the extraterritorial reach of Title VII only to American citizens controls. "'[W]hen the statute's language is plain, the sole function of the courts … is to enforce it according to its terms.'" *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004) (quoting *Lamie v. United States Tr.*, 540 U.S. 526 (2004) (alteration in *Bombadier*) (omission added)).

The Congress is under no obligation to extend the protection of its laws extraterritorially to every individual to whom it could do so and courts have read Title VII's extraterritorial jurisdiction provision narrowly. *See*, *e.g.*, *Iwata v. Stryker Corp.*, 59 F. Supp. 2d 600, 603 (N.D. Tex. 1999) (Title VII has "limited extraterritorial reach"); *Russell v. Midwest-Werner & Pfleiderer, Inc.*, 955 F. Supp. 114, 115 (D. Kan. 1997) ("Title VII applies only to American citizens employed abroad…."). Courts have

also read similar provisions in analogous statutes narrowly. *See*, *e.g.*, *Reyes-Gaona v. N.C. Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001) (interpreting Age Discrimination in Employment Act to have "limited extra-territorial application"); *Hu v. Skadden, Arps, Slate, Meagher & Flom LLP*, 76 F. Supp.2d 476, 477 (S.D.N.Y. 1999) (extraterritorial application of ADEA "clearly limited"); *O'Laughlin v. The Pritchard Corp.*, 972 F. Supp. 1352, 1364 (D. Kan. 1997) (finding that "intent of Congress" was to make "ADEA inapplicable to non-citizens of the United States working abroad"). Moreover, the Congress has explicitly chosen to extend extraterritorial coverage to an LPR in other statutes. *See*, *e.g.*, Arms Control Export Act, 22 U.S.C. § 2778(b) (coverage includes "every person" who engages in brokering activities with respect to defense articles; limited by International Traffic in Arms Regulation, 22 C.F.R. § 129.3(a), to apply only to a "U.S. person,"which includes an LPR. 22 C.F.R. § 120.15). Accordingly, we hold that Title VII does not extend extraterritorially to any person who is not an American citizen.

Shekoyan's alternative argument, that he was not employed "in a foreign country" within the meaning of Title VII, 42 U.S.C. § 2000e(f), is based on the facts that he was hired and trained in the United States, that many decisions related to his employment were made in the United States and that his letter of termination was sent to his Washington, D.C. residence. Because the employment letter contract between Sibley and Shekoyan stated Shekoyan's place of employment as "Tbilisi, Republic of Georgia" and classified him as "long-term personnel living in Georgia" and because Shekoyan resided and worked in Georgia throughout his employment with Sibley, however, we agree with the district court that Shekoyan was engaged in "employment in a foreign country."

B. *The FCA Claim*

The False Claims Act, 31 U.S.C. §§ 3729-3733, imposes a civil penalty and treble damages on any individual who, *inter alia*, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government … a false or fraudulent claim for payment or approval." *Id*. § 3729(a). The FCA permits a private party—a "relator"—to initiate a *qui tam* action on behalf of the government. *Id*. § 3730(b). The government has the option of taking over the suit or leaving it to the relator to prosecute. *Id*. In either case, the relator is entitled to a percentage of any recovery resulting from a successful suit. *Id*. § 3730(d)(1)-(2).

The FCA also contains a "whistleblower" protection provision which can give rise to a retaliation claim. The statute provides that:

> [a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee … in furtherance of an action under this section … shall be entitled to all relief necessary to make the employee whole.

*Id*. § 3730(h). To assert such a retaliation claim, the employee must show: (1) that he engaged in protected activity ("acts done … in furtherance of an action under this section"); and (2) that he experienced discrimination "because of" his protected activity. *Id*. To establish the second element, the employee must demonstrate that the employer had knowledge of the employee's protected activity and that the retaliation was motivated by the protected activity. *See United States ex rel. Yesudian v. Howard Univ*., 153 F.3d 731, 736 (D.C. Cir. 1998) (citing S. REP. NO. 99-345).

Shekoyan argues on appeal that the record raises a genuine

issue of material fact regarding whether he engaged in "protected activity" under the FCA and therefore the district court erred in granting summary judgment to Sibley. Under FED. R. CIV. P. 56, summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We review a grant of summary judgment *de novo*, applying the same standards as the district court, *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994), drawing all inferences from the evidence in favor of the non-movant. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

We have held that the language of the FCA "manifests Congress' intent to protect employees while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together." *Yesudian*, 153 F.3d at 740 (emphasis in original). Thus, while the employee "must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action," *United States ex rel. Hopper v. Anton*, 91 F.3d 1291, 1269 (9th Cir. 1996); *see also Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994), it is not necessary for a plaintiff "to 'know' that the investigation … could lead to a False Claims Act suit." *Yesudian*, 153 F.3d at 741. Nevertheless, "[m]ere dissatisfaction with one's treatment on the job is not … enough. Nor is an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations." *Id*. at 740. An employee does not engage in protected conduct if he "merely inform[s] a supervisor of the problem." *Zahodnick v. IBM Corp.*, 135 F.3d 911, 914 (4th Cir. 1997).

Determining whether an employee has engaged in protected conduct under the FCA is a "fact specific inquiry." *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 187 (3d Cir. 2001). Shekoyan has alleged several acts that could constitute fraud,

including payment of full-time salaries to persons receiving full-time salaries from other employers and use of project resources for personal benefit—such as project vehicles and GEAR-financed private residences. Shekoyan reported his concerns to one of his supervisors and asked whether he should raise them with USAID; he was told to let Sibley investigate first. The district court found, however, that the basis of Shekoyan's complaints "was because the plaintiff was apparently denied the use of such vehicles and not that the conduct was fraudulent." *Shekoyan II*, 309 F. Supp. 2d at 18. Particularly significant is Shekoyan's own deposition testimony, to wit: "I have never concluded that there was corruption. I thought that there are some issues that need to be kind of addressed or corrected or fixed or I don't know, worked out, but I did not conclude that there was a [sic] corruption." Shekoyan's own statement manifests that he did no more than "inform[] a supervisor of [a] problem," *Zahodnick*, 135 F.3d at 914, and thus did not engage in "protected activity" under the FCA.

## C. *The Pendent Claims*

Shekoyan contends that the district court erred when, after disposing of all of the federal claims upon which the court had exercised supplemental jurisdiction, it dismissed his pendent claims under District of Columbia law. Whether to retain jurisdiction over pendent state and common law claims after the dismissal of the federal claims is "a matter left to the sound discretion of the district court" that we review for abuse of discretion only. *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265–66 (D.C. Cir. 1995).

"[P]endent jurisdiction is a doctrine of discretion, not a plaintiff's right." *United Mine Workers Ass'n v. Gibbs*, 383 U.S. 715, 726 (1966). A district court may choose to retain jurisdiction over, or dismiss, pendent state law claims after

federal claims are dismissed. 28 U.S.C. § 1367(c)(3).[4] *Edmondson & Gallagher*, 48 F.3d at 1265–66. "[I]n the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Shekoyan argues that this is not "the usual case," *id*., because the litigation proceeded for four years in the district court prior to the dismissal of the last of his federal claims and because the district judge was familiar with District of Columbia law, having served previously for 18 years as a D.C. Superior Court judge. Yet judicial economy is not the only relevant factor and the district court properly considered comity as well as fairness to the plaintiff in concluding that its rejection of his non-federal claims would "not adversely impact plaintiff's ability to pursue

---

[4] The statute provides that a district court

> may decline to exercise supplemental jurisdiction … if:
>
> > (1) the claim raises a novel or complex question of State law,
> >
> > (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> >
> > (3) the district court has dismissed all claims over which it has original jurisdiction, or
> >
> > (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In exercising its discretionary authority to retain or dismiss pendent claims, the district court is to be "guided by consideration of the factors enumerated in 28 U.S.C. § 1367(c)." *Edmondson & Gallagher*, 48 F.3d at 1266.

[those] claims in the local court system." *Shekoyan II*, 309 F. Supp. 2d at 22. We find no abuse of discretion in the district court's dismissal of Shekoyan's pendent claims.

D. *Contested Procedural Orders*

Shekoyan also contests two procedural orders issued by the district court during the course of the litigation. The first is the district court's refusal to permit Shekoyan to file a motion for summary judgment after the deadline for filing dispositive motions. Order, Case No. 00-2519 (February 3, 2004) (summary judgment order). The second is the district court's denial of Shekoyan's motion for Rule 11 sanctions against Sibley's lawyers. Order, Case No. 00-2519 (February 17, 2004) (Rule 11 Order). We review both orders for abuse of discretion. *See Atchinson v. District of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996) (reviewing denial of motion to amend complaint for abuse of discretion); *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405 (1990) ("[A]n appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's Rule 11 determination."). In the Rule 11 context, we note that a district court "would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id*.

Rule 16 of the Federal Rules of Civil Procedure instructs the district court to "enter a scheduling order that limits the time … to file motions [and] to complete discovery." FED. R. CIV. P. 16(b). On December 6, 2002 the district court issued a scheduling order that required all dispositive motions to be filed by March 28, 2003. Order, Case No. 00-2519 (December 6, 2002) (Scheduling Order I). This deadline was later extended to April 28, 2003. Order, Case No. 00-2519 (February 24, 2003) (Scheduling Order II). Shekoyan filed his "Motion to File Motion for Summary Judgment Out of Time" on January 30, 2004—more than nine months after the deadline set by

Scheduling Order II. Shekoyan's explanation for the delayed filing is that he had finally obtained an eyewitness declaration corroborating his allegations of discrimination at Sibley. Yet Shekoyan had earlier filed a motion to supplement his opposition to Sibley's motion for summary judgment with the newly obtained declaration, which allowed the district court to consider the material in evaluating whether summary judgment was warranted. *See* Summary Judgment Order. Moreover, corroboration of Shekoyan's version of the facts was irrelevant to the summary judgment analysis. At the summary judgment stage, all inferences from the evidence are to be drawn in favor of the non-movant. *Reeves*, 530 U.S. at 150. Thus, the district court was already under an obligation to accept as true Shekoyan's allegations of discrimination in ruling on Sibley's motion for summary judgment. We therefore conclude that the district court did not abuse its discretion in denying Shekoyan's motion.

Rule 11 of the Federal Rules of Civil Procedure provides for sanctions for filing a paper with the court "for any improper purpose," including harassment, delay or increasing the costs of an opponent in litigation. FED. R. CIV. P. 11(b)(1). Likewise, all legal and factual allegations made by a litigant before the court must be made in good faith. *Id.* Shekoyan filed his motion for Rule 11 sanctions in response to Sibley's motion to strike from the record the disputed unsigned and unnotarized affidavits submitted by Shekoyan's lawyer. Rule 11 Order at 11. Shekoyan accused Sibley's lawyers of bad faith in filing the motion to strike, eliciting perjured testimony and manipulating witnesses, and violating the district court's Local Rule 7(m), which requires counsel to confer with opposing counsel before filing non-dispositive motions. *See* Rule 11 Order at 11–12; LCvR 7(m). In particular, Shekoyan claimed to have an audio recording of his lawyer's conversation with David Bose that verified the content of the draft declaration and established

Sibley's witness manipulation. The district court found that the motion to strike was justified but that Sibley had violated Local Rule 7(m) by failing to discuss the motion with Shekoyan. Despite being "troubled" by the competing claims of inaccuracy with respect to the Bose and Vanderhoof declarations, the court refused to "sift through" the audio recording in order to determine which party's account was accurate. Rule 11 Order at 12–13. Instead, it ruled that Shekoyan could use the recording to impeach Sibley's witnesses at trial. *Id*. at 13. The Supreme Court has instructed that: "[t]he district court is best acquainted with the local bar's litigation practices and thus best situated to determine when a sanction is warranted to serve Rule 11's goal[s]." *Cooter & Gell*, 496 U.S. at 404. We ordinarily find that "decisions concerning Rule 11 sanctions are better left to the discretion of the district court which has a bird's eye view of the actual positions taken by the litigants," *Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1013 (7th Cir. 2004) (citing *Brandt v. Schal Assocs., Inc.*, 960 F.2d 640, 645 (7th Cir. 1992)), and will not second guess the factual determinations integral to the district court's decision not to impose Rule 11 sanctions.

For the foregoing reasons, the decision of the district court is affirmed.

*So ordered*.