# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 12, 2024        Decided August 8, 2025

No. 24-7032

UNITED STATES OF AMERICA, EX REL. ANIL KINI,
AND
ANIL KINI,
APPELLANT

v.

TATA CONSULTANCY SERVICES, LTD,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02526)

———

*Daniel Kotchen* argued the cause for appellant. On the briefs was *Daniel Low*.

*Daniel S. Volchok* argued the cause for appellee. With him on the brief were *Lauren N. Moore* and *Howard M. Shapiro*.

Before: WILKINS, KATSAS and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

Opinion concurring in part and dissenting in part filed by

*Circuit Judge* KATSAS.

CHILDS, *Circuit Judge*: Anil Kini appeals the district court's dismissal of his *qui tam* action brought under the False Claims Act (FCA), 31 U.S.C. §§ 3729–3733. *U.S. ex rel. Kini v. Tata Consultancy Servs., Ltd.*, No. 17-cv-2526, 2024 WL 474260, at *1 (D.D.C. Feb. 7, 2024). In his first amended complaint, Kini alleges that his employer, Tata Consultancy Services, Ltd. (TCS), fraudulently obtained L-1 and B-1 visas for information technology (IT) employees who should have been sponsored under the H-1B visa program and, by doing so, avoided higher application fees and payroll taxes owed to the government. Kini also alleges that TCS retaliated against him for reporting the alleged misconduct to TCS's management.

Based on these allegations, Kini asserts two FCA violations: a reverse false claim for knowingly avoiding an obligation to pay money to the government under 31 U.S.C. § 3729(a)(1)(G) and a retaliation claim for alleged adverse employment actions taken in response to his protected whistleblowing activity under 31 U.S.C. § 3730(h). The district court dismissed the first amended complaint for failure to state a claim. Kini now appeals. For the reasons set forth below, we affirm the district court's dismissal of the reverse false claim. However, we reverse the dismissal of Kini's retaliation claim and remand the case for further proceedings.[1]

## I.

### A.

Originally enacted during the Civil War, the FCA allows

---

[1] Our colleague dissents only insofar as he would hold that Kini also failed to state a claim for retaliation.

individuals to bring claims on behalf of the government to "protect[] federal funds from fraud." *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 545–46 (D.C. Cir. 2002); *see also United States v. Bornstein*, 423 U.S. 303, 305 n.1, 309 (1976); *United States v. McNinch*, 356 U.S. 595, 599 (1958). The FCA imposes civil penalties and treble damages on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Two provisions of the FCA are relevant to this action.

*First*, the *reverse false claim provision* imposes liability for fraudulent conduct that deprives the government of money that it is owed. The provision makes liable any person who

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

*Id.* § 3729(a)(1)(G). To state a reverse false claim, the relator must allege this obligation and its effect(s) "with particularity." FED. R. CIV. P. 9(b). The FCA defines an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

*Second*, the FCA's *anti-retaliation provision* protects whistleblowers "who seek to expose or to prevent government fraud." *Singletary v. Howard Univ.*, 939 F.3d 287, 293 (D.C. Cir. 2019). The provision's purpose "'assure[s] those who may

be considering exposing fraud that they are legally protected from retaliatory acts.'" *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998) (quoting S. Rep. No. 99-345, at 34 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5299). Section 3730(h) authorizes suit by an employee who "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done . . . in furtherance of an action under this section or other efforts to stop . . . violations of this subchapter." 31 U.S.C. § 3730(h). To state a retaliation claim, an employee must allege (1) engagement in a protected activity, and (2) discrimination because of that activity. *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 422 (D.C. Cir. 2005). Unlike reverse false claims, Rule 9(b)'s heightened pleading standard is inapplicable to retaliation claims, even those alleging conduct protected by the FCA. *Singletary*, 939 F.3d at 303.

**B.**

Because Kini appeals from an order granting a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, the relevant facts are those "alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)). "We accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in . . . [Kini's] favor." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

TCS hired Kini in April 2006.[2] TCS is "an Indian multinational corporation that provides information technology and consulting [outsource staffing] services" to a world-wide client base. 1st Am. Compl. ¶ 5 (J.A. 8). While its headquarters are in Mumbai, India, TCS operates twenty-two offices in the U.S., which are staffed by approximately 40,000 employees.

Kini claims that when companies award contracts for services to TCS in the U.S., TCS typically fills positions with foreign workers "because it can pay these employees a fraction of what American [IT] workers demand to perform the same or similar work" and "earn[s] a substantial profit while undercutting its competition by offering lower prices to clients." *Id.* ¶ 12 (J.A. 9). But there's a catch: for these foreigners to work in the U.S., they must possess a government work visa. To that end, TCS "applies for and secures three types of visas for its foreign workforce: H-1B, L-1, and B-1." *Id.* ¶ 14 (J.A. 10).

According to Kini, H-1B visas are for "specialty occupations that require theoretical or technical expertise," *id.* ¶ 15 (J.A. 10), and cost $6,460 to secure. He identifies the two types of L-1 visas—L-1A for management-level supervisory employees and L-1B for organizational subject matter experts—and states that both require an application fee of $5,460. Finally, Kini explains that B-1 visas are for temporary activities and are generally inappropriate for any TCS job but are the cheapest to procure at $160.

Kini contends that after TCS finalized a 5-year contract with Western Union in November 2012, TCS assigned him to

---

[2] Unless otherwise noted, the following background is derived from Kini's first amended complaint.

serve as the onsite service delivery manager for the Western Union account, prompting his relocation to Denver, Colorado. In 2014, Kini's responsibilities allegedly expanded to include reviewing the petitions for extensions to the L-1A visas held by his team members. In that capacity, Kini says that "he noticed a number of discrepancies in his team members' roles and reporting structure, which . . . did not match the actual role or reporting hierarchy for L-1A employees on the Western Union client account." *Id.* ¶ 52 (J.A. 23). When Kini raised the issue, a TCS client partner purportedly advised that Kini should not get involved.

Sometime between September 2016 and January 2017, TCS made Kini the "Business Relationship Manager for Western Union." *Id.* ¶ 31 (J.A. 15). "In this role, . . . Kini managed the business development of the client by identifying and implementing IT-related services to meet Western Union's needs." *Id.* Despite the promotion, Kini allegedly remained responsible for reviewing L-1A visa materials for TCS employees. *Id.* ¶ 53 (J.A. 23). In that capacity, Kini says he observed TCS's ongoing use of fraudulent visa practices, including the requirement that he "fabricate employee roles and reporting structures" to align with "the information contained in the employees' L-1A visa petitions." *Id.* ¶ 53 (J.A. 23–24).

On May 1, 2017, Kini submitted a "whistleblower report" to both the CEO and vice president of human resources of TCS, detailing what he described as "fraudulent visa practices and other illegal, corrupt, and unethical conduct he had observed while working on the Western Union client account." *Id.* ¶ 63 (J.A. 28) (referencing J.A. 59–115). On June 22, 2017, Kini submitted a "follow-up report" "detailing additional visa abuses and illegal practices within the Western Union client account since the time of his initial May 1, 2017 report." *Id.* ¶ 65 (J.A. 29) (referencing J.A. 117–129). Five days later, on

June 27, 2017, TCS informed Kini that it had hired an independent investigator to "look into the issues raised in . . . Kini's whistleblower reports." *Id.* ¶ 66 (J.A. 29).

During the remaining months of 2017, Kini exchanged communications and information with the independent investigator regarding the alleged visa fraud. He also filed a *qui tam* action under seal in the district court on November 22, 2017, alleging that TCS violated the FCA and retaliated against him for engaging in activity protected by the statute. *See* Compl., *Kini*, 2024 WL 474260 (No. 1:17-cv-02526), Dkt. No. 1.

On January 2, 2018, Kini submitted a "follow-up whistleblower complaint" to the independent investigator, reiterating "his concerns regarding ongoing visa fraud and the discrimination/hostility he had experienced within the Western Union account and by [TCS] after raising his concerns." 1st Am. Compl. ¶ 71 (J.A. 30) (referencing J.A. 166–79). Following that submission, Kini alleges that TCS immediately began imposing "unrealistic performance goals" on him. *Id.* ¶ 72 (J.A. 31). Approximately two weeks later, on January 18, 2018, Kini submitted an additional "follow-up whistleblower complaint" to TCS regarding the purported L-1A visa fraud. *Id.* (J.A. 30) (referencing J.A. 181–91). The next day, TCS allegedly removed Kini from the Western Union account and told him "that if he did not find a new project role within two weeks, he would be terminated." *Id.* ¶ 77 (J.A. 34).

On May 30, 2018, TCS's vice president of human resources informed Kini about the results of the independent investigator's investigation, stating that "'most of the issues raised by [Mr. Kini we]re not substantiated' and that for the issues for which the company did find a violation, 'the Company ha[d] already taken corrective action.'" *Id.* ¶ 79 (J.A.

34) (alterations in original) (quoting J.A. 220). TCS fired Kini on August 9, 2018, citing a "lack of matching roles for [his] skillset." Compl., Ex. 45, *Kini*, 2024 WL 474260 (No. 1:17-cv-02526), Dkt. No. 39-46 at 2.

## C.

Nearly fifty-seven months after Kini filed his *qui tam* complaint, the government filed a notice of election to decline intervention in the suit on August 24, 2022, pursuant to 31 U.S.C. § 3730(b)(4)(B).[3] The district court then unsealed the complaint. On October 14, 2022, Kini amended the complaint to enrich his allegations. TCS moved to dismiss the claims in the first amended complaint.

The district court granted TCS's motion to dismiss the reverse false claim, holding that Kini failed to state a claim for relief because TCS "was not obligated, within the meaning of the FCA, to pay higher payroll taxes for its employees or pay application fees for applications it never sought." *Kini*, 2024 WL 474260, at *1. The district court also dismissed Kini's retaliation claim, concluding that he had not engaged in FCA-protected activity. *Id.* In doing so, the district court reasoned that Kini's reports concerned only "potential statutory and regulatory violations, which do not give rise to a FCA action," *id.* at *6, and therefore, did not reflect an effort to prevent TCS from violating the FCA.

Kini timely appealed the dismissal of his claims.

---

[3] "The FCA permits a private party—a 'relator'—to initiate a *qui tam* action on behalf of the government." *Shekoyan*, 409 F.3d at 422. "The government has the option of taking over the suit or leaving it to the relator to prosecute." *Id.* "In either case, the relator is entitled to a percentage of any recovery resulting from a successful suit." *Id.*

9

## II.

We have jurisdiction over this appeal. 28 U.S.C. § 1291. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks omitted). "We review the district court's dismissal *de novo* and may affirm its judgment on any basis supported by the record." *Elec. Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1236 (D.C. Cir. 2018).

## III.

Kini contends that the district court erred in dismissing his first amended complaint on two grounds. He maintains that he adequately pleaded a reverse false claim by alleging that TCS had an obligation to pay higher payroll taxes based on higher H-1B wages and an obligation to pay higher H-1B application fees. He also asserts that his allegations are sufficient to show that he engaged in protected whistleblower activity to support a retaliation claim. We address each claim in turn.

### A.

For his reverse false claim, Kini alleges that TCS fraudulently applied for cheaper L-1 and B-1 visas for work it knew required H-1B visas, underpaying H-1B visa employees, decreasing its payroll tax obligation, and fraudulently directing employees without H-1B visas to perform work that required an H-1B visa. To adequately plead a reverse false claim, Kini

must allege that TCS's actions "knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay or transmit money or property to the [g]overnment." 31 U.S.C. § 3729(a)(1)(G). Because we subject reverse false claims to a heightened pleading standard, Kini must allege the fraud "with particularity," FED. R. CIV. P. 9(b), by "plead[ing] the time, place, and content of the fraud and . . . identify the individuals allegedly involved." *U.S. ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 936 (D.C. Cir. 2017).

Kini presents two theories of TCS's "obligation" under § 3729(a)(1)(G): (1) a Department of Labor regulation requiring employers to pay H-1B workers a particular wage rate and file an application with the department attesting to do so, combined with the tax code's payroll tax requirement necessitating the payment of higher payroll taxes based on the H-1B required wage, and (2) U.S. Citizenship and Immigration Services (USCIS) regulations requiring a higher application fee for H-1B visas. Neither is sufficient in connection with Kini's allegations to create a cognizable obligation for purposes of the FCA. Accordingly, we affirm the district court's dismissal of Kini's reverse false claim.

**1.**

Kini first argues that TCS failed to adhere to an obligation to remunerate H-1B employees their "required wage rate," Appellant's Br. 6, and paid them "substantially less – e.g., 30% less – than non-visa-reliant workers," 1st Am. Compl. ¶ 41 (J.A. 19). The failure to pay the required wage rate in turn resulted in TCS not satisfying its "regulatory obligation under 20 C.F.R. § 655.731" and its LCA "to pay higher withholding taxes" to the government based on the higher H-1B required wage. Appellant's Br. 20–21. According to Kini, "by fraudulently certifying and failing to pay its H-1B employees

the required wage rate," TCS "reduced the amount of federal payroll tax it otherwise would have been required to pay the federal government." 1st Am. Compl. ¶ 89 (J.A. 38).

H-1B visas cover "occupations that require the theoretical and practical application of a body of highly specialized knowledge and a bachelor's degree or higher in a directly related specific specialty (or its equivalent)." *H-1B Cap Season*, USCIS, https://perma.cc/6FCZ-MEGK. To procure H–1B visas for their employees, an employer files a labor condition application (LCA) with the Department of Labor using the procedures laid out in 8 U.S.C. § 1182(n). As part of the LCA, the employer must state that it will offer "wages that are at least—(I) the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question, or (II) the prevailing wage level for the occupational classification in the area of employment, whichever is greater." *Id.* § 1182(n)(1)(A)(i). The LCA requires employers to pay an H–1B employee this "required wage rate" "for the entire period of authorized employment," 20 C.F.R. § 655.731(a) (2024), as soon as the H-1B worker "enters into employment," *id.* § 655.731(c)(6).

Kini requests that we find that any reduction in the payment of required wages to H-1B workers under 20 C.F.R. § 655.731(a) and the associated taxes to the government creates an obligation that can support a reverse fraud claim. *See, e.g.*, Appellant's Br. 18. Section 655.731(a) alone does not appear to support Kini's interpretation because the regulation generally creates a duty to pay H-1B visa employees. *U.S. ex rel. Billington v. HCL Techs. Ltd.*, 126 F.4th 799, 804 (2d Cir. 2025) ("Although relators focus on . . . 20 C.F.R. § 655.731(a), that is not the obligation at issue for purposes of the FCA. That regulation . . . obligates HCL 'to pay H-1B visa employees' a certain wage."). In this regard, the FCA requires relators to

show an obligation "to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). While § 655.731(a) compels an employer to pay H-1B employees specified wages, it does not force an employer to pay or transmit money or property to the government. Because § 655.731(a) does not reference money owed to the government, the regulation does not create the requisite obligation for a reverse false claim under the plain meaning of the provision.

However, even if Kini is correct that § 655.731(a) combines with the payroll tax requirement to create an obligation under the FCA, his claim still fails. Kini fails to plausibly plead a payroll tax obligation to the government because he does not allege "time, place, and content" of the circumstance demonstrating TCS's failure to pay the government taxes due for the wages it paid to its H-1B employees. At most, he alleges that TCS underpaid one or more H-1B visa employees with unknown profiles as compared to unidentified people in unnamed "similar roles," 1st Am. Compl. ¶¶ 42–43 (J.A. 19–20), and precisely underpaid H-1B employees "on the order of 30% of their salaries," *id.* ¶ 89 (J.A. 38–39). Additionally, the tax code only mandates an employer to pay taxes on wages it actually paid to its employees. *See* 26 U.S.C. § 3111(a). The requirement in 20 C.F.R. § 655.731 and the LCA to pay H-1B visa workers a particular required wage rate does not modify the tax code's requirement to pay payroll taxes only on wages actually paid.

Therefore, because Kini does not sufficiently plead TCS's failure to adhere to an obligation to pay higher payroll taxes for certain H-1B employees, the district court did not err in

dismissing his reverse false claim.[4]

**2.**

Kini's second theory is that TCS fraudulently applied for cheaper L-1 or B-1 visas and, thus, avoided its obligation to pay the government higher H-1B visa fees.[5] USCIS "manage[s] the process that allows individuals from other countries to work in the United States." *What We Do: Working in the U.S.*, USCIS, https://perma.cc/SS7Q-FDXH. USCIS requires employers to pay the correct fee(s) for submission of an "application, petition, or request." U.S. CITIZEN & IMMIGR. SERVS., FORM G-1055, at 1 (Apr. 15, 2025), https://perma.cc/PRB4-325P. However, this requirement to pay the correct fee for the visa application submitted does not create an FCA obligation. Kini relies on immigration regulations that only oblige employers to pay fees on the visas for which they applied. Per Kini's pleadings, TCS applied for L-1 and B-1 visas and paid the fees those applications require. Because TCS never applied for the H-1B visas that require the higher fees, it had no such obligation within the meaning of the FCA to pay for visas it never sought.

---

[4] The FCA contains a "tax bar" in that it "does not apply to claims, records, or statements made under the Internal Revenue Code." 31 U.S.C. § 3729(d). Because Kini has not sufficiently alleged TCS's obligation to pay higher payroll taxes, we decline to address its argument that the FCA tax bar also warrants dismissal of the payroll tax claim.

[5] Kini describes four FCA reverse false claim obligations TCS avoided with this scheme: (1) an obligation to pay H-1B visa application fees that TCS knew required H-1B visas and obtained L-1 and B-1 visas instead, Appellant's Br. 30–34; (2) an obligation to pay H-1B application fees arising from 8 C.F.R. § 214.2(h)(2)(i)(E) and § 214.2(l)(7)(i)(C) and to submit an H-1B petition with fees

In reaching this outcome, we join our sister circuits. *Billington*, 126 F.4th at 805 ("[A]n obligation to pay higher visa application fees does not exist by the mere fact of a violation of immigration laws because that violation does not trigger an immediate and self-executing duty to pay the government those fees. . . . [T]he penalties . . . would not include fees for visa applications HCL never submitted." (cleaned up)); *U.S. ex rel. Lesnik v. ISM Vuzem d.o.o.*, 112 F.4th 816, 820 (9th Cir. 2024) ("[I]t is not sufficient that defendants applied for the wrong visas . . . . They had no established duty to pay for visas for which they did not apply. . . . [T]he only specific, legal obligation . . . for the B-1 visas was to pay the application fees for those visas.") (internal quotation marks omitted).

Furthermore, the authority Kini relies on the most to support his arguments—*Franchitti v. Cognizant Technology Solutions Corp.*, 555 F.Supp.3d 63 (D.N.J. 2021), and *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189 (10th Cir. 2006)—lack persuasive value. *See Lesnik*, 112 F.4th at 820 (declining to follow "*Franchitti* . . . , the sole district court decision holding that in similar factual circumstances, a defendant had an 'obligation' to pay application fees for visas for which it did not apply[,] . . . [because] the court never

when TCS instructed L-1 and B-1 workers to perform H-1B work, Appellant's Br. 34–35; (3) an obligation to pay H-1B application fees arising from fee-based relationships due to the benefit of the visas received by TCS to perform H-1B work, even if it did not initially apply for H-1B visas, Appellant's Br. 35–38; and (4) an obligation to pay H-1B application fees arising from a contractual/implied contractual relationship with the government when certifying its visa applications are true and correct and receiving the benefits of the visas from the government in exchange for complying with the regulatory and statutory visa requirements, including paying fees, Appellant's Br. 38–39.

identified any legal authority that would establish such an obligation"); *U.S. ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1233 (10th Cir. 2017) (finding *Conagra*, unlike this case, involved "a legally established duty to pay the USDA to issue new certificates . . . . [which was] a necessary and a sufficient condition for a monetary obligation").

TCS never applied for the H-1B visas that would have obligated it to pay the higher application fee of $6,460. Thus, it had no such obligation—at least not within the meaning of the FCA—to pay for visas it never sought. We accordingly affirm the district court's dismissal of Kini's visa fee claim because TCS did not have a duty to pay fees for applications it never submitted.

**B.**

As to his retaliation claim, Kini sufficiently pleaded that he engaged in protected conduct about which TCS was aware and retaliated against him.[6] As such, the district court erred in dismissing Kini's retaliation claim.

**1.**

"For the first requirement—engaging in protected activity—it is sufficient that a plaintiff be investigating matters that reasonably could lead to a viable FCA case." *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 66 (D.C. Cir. 2008) (cleaned up). This protected conduct element "requires only that the plaintiff have engaged in 'acts . . . *in furtherance of* an action under this section.'" *Yesudian*, 153 F.3d at 739 (alteration in *Yesudian*)

---

[6] We reiterate that Rule 9(b)'s heightened pleading standard is inapplicable to retaliation claims, even those alleging conduct protected by the FCA. *Singletary*, 939 F.3d at 303.

(quoting 31 U.S.C. § 3730(h)). This means that the FCA covers two forms of protected activity: (1) "steps taken antecedent to a False Claims Act proceeding" and (2) "lawful acts done in furtherance of 'other efforts to stop 1 or more violations of [the FCA].'" *Singletary*, 939 F.3d at 295 (quoting 31 U.S.C. § 3730(h)(1)). Under the former, the plaintiff's investigation must concern false or fraudulent statements or records concealing, avoiding, or decreasing an obligation to pay the government, *Hoyte*, 518 F.3d at 66, whereas under the latter the employee must show "an objectively reasonable belief that the employer is violating, or will violate," the FCA, *Singletary*, 939 F.3d at 296.

Kini argues that he adequately pleaded allegations covering both forms of protected activity under § 3730(h)(1). First, Kini contends he alleged "in furtherance of" protected activity in stating that he "investigated" and "documented" his allegations, "assisted . . . in preparation of his amended complaint and initial complaint" and "disclosed TCS's fraudulent scheme to the appropriate government officials." Appellant's Br. 58–59 (quoting 1st Am. Compl. ¶ 103 (J.A. 42)) (cleaned up). Next, Kini states he plausibly alleged efforts to stop FCA violations by reporting "allegations . . . to TCS leadership, including sending to TCS executives and an investigator . . . lengthy reports and other evidence complaining about fraud, visa abuse, and illegal practices, met with an investigator about those reports, and disclosed the fraud to government officials." *Id.* at 56 (citing 1st Am. Compl. ¶¶ 63–72, 103 (J.A. 28–31, 42)) (cleaned up).

Our dissenting colleague takes the position that Kini failed to plausibly allege that he engaged in FCA-protected conduct. *See* Partial Dissent at 1–2. We disagree. Because Kini only must allege that he "took lawful measures to stop or avert what [he] reasonably believed would be a violation of the False

Claims Act," *Singletary*, 939 F.3d at 297, plausible factual allegations of protected activity are contained within Kini's reporting of FCA violations to TCS, particularly on May 1, 2017, June 22, 2017, and January 18, 2018. On each of these days, Kini submitted communications to TCS—which he described in the first amended complaint and attached to it as exhibits—expressing concerns regarding the existence of government fraud regarding visas and TCS's violation of the FCA through its failure to address it. In his initial whistleblower report, Kini observed that, "[c]onsidering the current mandate from USCIS under [the] Trump administration, the implications of US Visa abuse are huge for TCS & [the] entire Indian IT industry, as a whole." J.A. 110. In addition, after providing a specific description of fraudulent L-1A visa conduct, Kini inquired whether TCS will "stop these illegal practices and visa abuses . . . before DHS/USCIS comes to know of it." J.A. 120. In another example, Kini asserted that because TCS "should be fully aware of USCIS rules with regards to US Visas for all categories," he should not have to file "a Whistle Blower Complaint" for the company "to check this fraud." J.A. 184. Moreover, in his January 2, 2018 whistleblower report to the independent investigator, Kini questioned whether TCS leadership was "aware of the grave implications of US Visa Fraud?" J.A. 171.

Because we accept Kini's factual allegations as true at the Rule 12(b)(6) stage and draw all justifiable inferences in Kini's favor, there are sufficient allegations of protected activity under § 3730(h)(1) to satisfy the first element of an FCA retaliation claim.[7]

---

[7] We note that in Kini's communications with TCS, he alerted the company to visa fraud but did not expressly warn it about depriving the U.S. government of the higher application fees and payroll taxes. However, because the case is at the motion to dismiss stage, the first amended complaint did reasonably permit an inference that TCS was

**2.**

To establish the second element of his FCA retaliation claim, Kini "must also plausibly allege (i) a qualifying retaliatory employment action, (ii) [TCS]'s knowledge that [he] was engaged in protected activity, and (iii) facts showing that the employment action was caused by [his] engagement in that activity." *Singletary*, 939 F.3d at 299. Kini's first amended complaint satisfies these elements.[8] He alleges that TCS took multiple retaliatory actions against him because the company was aware of his protected actions.

Based on the allegations of the first amended complaint, TCS had notice of Kini's protected conduct starting on May 1, 2017, when he "submitted a 57-page whistleblower report to" TCS's CEO and Vice President of Human Resources. 1st Am. Compl. ¶ 63 (J.A. 28). Over the course of the following year, Kini sent additional follow-up reports to TCS, met with an independent investigator, who was appointed by TCS, and provided the investigator with evidence. *Id.* ¶¶ 64–72 (J.A. 28–31). He pleaded causation alleging that TCS began to retaliate immediately on May 1, 2017, which eventually culminated in his termination on August 9, 2018. *Id.* ¶ 73 (J.A. 31–32). As to specific retaliatory acts, Kini alleged that TCS reduced his pay, denied his promotion, stripped him of his leadership role, removed him from the Western Union client account, and then fired him. *Id.* ¶¶ 73-81 (J.A. 31–36). Kini also pleaded the requisite employer's knowledge alleging that TCS directed retaliatory, discriminatory, and hostile conduct

on notice of potential FCA violations when Kini submitted his whistleblower communications to the company.

[8] Kini asked for an opportunity to clarify his allegations if we determined that he failed to "adequately state second prong protected activity." Appellant's Br. 59–60. Because Kini adequately pleaded a claim for retaliation, we deem this request to amend moot.

towards him after he raised his concerns about the alleged visa fraud. *Id.* ¶¶ 71–75, 77 (J.A. 30–34).

Viewing these allegations in the light most favorable to Kini, he sufficiently alleged TCS's knowledge of his protected activity, its commission of retaliatory conduct against him, and a connection between the conduct and his protected activities. As such, the district court erred in finding that Kini did not adequately plead a retaliation claim.

\*\*\*\*\*

For the foregoing reasons, we affirm the district court's dismissal of Anil Kini's FCA reverse false claim. We reverse the dismissal of Kini's retaliation claim and remand the case for further proceedings consistent with this opinion.

*So ordered.*

KATSAS, *Circuit Judge*, concurring in part and dissenting in part: Anil Kini brought this False Claims Act action against his former employer, Tata Consultancy Services, Ltd. Kini alleges that Tata fraudulently avoided monetary obligations to the United States and retaliated against him for trying to stop its FCA violations. As the Court persuasively explains, Kini failed to state a claim for avoiding monetary obligations to the government. In my view, Kini also failed to state a claim for retaliation.

The False Claims Act prohibits various forms of fraud against the United States, including the knowing avoidance of any obligation "to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The FCA also makes it unlawful for an employer to retaliate against an employee "because of lawful acts done by the employee … in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations" of the FCA. *Id.* § 3730(h)(1). This text creates two distinct intent elements: The employee must act to stop an FCA violation, and the employer must retaliate against the employee because he is so acting. To form the prohibited retaliatory intent, the employer therefore must *know* that the employee was acting *to stop an FCA violation*. *See*, *e.g.*, *Singletary v. Howard Univ.*, 939 F.3d 287, 300 (D.C. Cir. 2019); *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998).

As my colleagues ably demonstrate, the operative complaint alleges at length that Kini was fired soon after repeatedly urging Tata to stop engaging in visa fraud. *Ante* at 16–17. But the complaint nowhere suggests that Kini raised the further possibility that any such abuses might have created FCA liability for avoiding visa application fees or payroll taxes owed to the government—novel theories that the Court rightly rejects as legally unfounded. So in my view, although the complaint supports a more-than-plausible inference that Tata retaliated against Kini for his efforts to stop alleged violations

of the Immigration and Nationality Act, it does not support a plausible inference that Tata retaliated against him for any efforts to stop alleged FCA violations.

As to the requisite employer knowledge, the complaint here contains much less than the operative complaint in *Singletary*. In that case, this Court held that the plaintiff had stated an FCA retaliation claim by alleging that she was fired after complaining to her employer not only that it was mistreating laboratory animals, but also that the alleged mistreatment "violated funding requirements" and "conditions under which [her employer] received grant money from NIH and the federal government." *See* 939 F.3d at 300–01. Here, in contrast, the complaint says nothing about whether Tata was violating obligations to pay money to the government.

In sum, I would affirm the district court's dismissal of Kini's complaint in its entirety.